IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
(Civil Division)

| | | |
|---|---|---|
| ANDREW STEWART, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION No. 09-cv-02612 WDQ |
| BERT BELL/PETE ROZELLE NFL | : | |
| PLAYER RETIREMENT PLAN, *et al.* | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF MOTION TO COMPEL DISCOVERY**

**I.     INTRODUCTION**

Andrew Stewart is a former National Football League ("NFL") football player who suffered severe injuries to his hand, knee and foot while he was playing in the NFL from 1989 to 1993. He subsequently played in the Canadian Football League ("CFL") and also suffered injuries during that time. A "neutral physician" selected by Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "NFL Plan") examined Stewart and has affirmatively stated that Stewart's NFL injuries *alone* were sufficient to cause his current disability. The NFL Plan considers Stewart to be disabled from gainful employment but denies that his disability is caused by injuries suffered during his NFL playing days. Thus, Stewart is receiving "Inactive" disability benefits rather than "Football Degenerative" benefits, which are designed to cover disabling conditions that materialize many years after the player has retired from NFL football. The NFL Plan contends that Stewart's CFL injuries preclude an award of the "Football Degenerative" benefits. The difference amounts to thousands of dollars per month and hundreds of thousands of dollars during Stewart's lifetime.

ERISA requires the NFL Plan and its Retirement Board (the fiduciary that has ultimate responsibility to approve or deny benefit claims) to provide a "full and fair review" of Stewart's claim. This Court will need to determine whether the Plan's denial of disability benefits complies with that mandate; therefore, it must have all the facts, and not just the Plan's version of events. To that end, Plaintiff seeks to depose two members of the Retirement Board who were involved in the decision not to award Football Degenerative benefits and the very puzzling sequence of events leading to that decision, which are discussed in detail below.

There are two interlocking purposes to the depositions. First, the NFL Plan's documentation of the decision fails to include all of the information necessary for this Court to evaluate the reasonableness of the NFL Plan's decision. It is axiomatic under ERISA that this Court must have the complete record developed by the fiduciaries in conjunction with Stewart's claim and appeal. The requested discovery will fill the gaps in the record so that the Court will have a complete understanding of the case. Second, Stewart is entitled to discovery to determine the depth of the conflict of interest that has affected the NFL Plan's decision in this particular case. Accordingly, Stewart now seeks an order from this Court compelling the NFL Plan to make available for depositions one member of the Retirement Board appointed by the NFL and one member appointed by the NFLPA.

## II.     BACKGROUND TO THE DISCOVERY DISPUTE

### A.     Stewart's Playing Career

Stewart was drafted by the Cleveland Browns in 1989 as a defensive end. He played for the Browns during the 1989 season. In 1990, while in training camp with the Cleveland Browns, Mr. Stewart suffered a partial tear of his right Achilles tendon and missed the entire 1990 season. In 1991, while in training camp with the Cincinnati Bengals, Mr. Stewart suffered a torn left

ACL and left lateral meniscus.  Mr. Stewart had surgery on the damaged left knee and was out for the remainder of 1991 season and the entire 1992 season.  In 1993, Mr. Stewart signed with the 49ers.  While practicing in Barcelona, Spain for a pre-season game, he suffered a severe injury to his right hand that, according to the medical records, required "difficult" surgery to repair.  He was out for the remainder of the 1993 season.  Mr. Stewart subsequently became employed by teams in the CFL.  In 1996, he suffered a right elbow injury and tear of his right triceps.  In 2000, he tore his right quadriceps tendon, which was then repaired.  After that injury, he ended his football career.[1]

      **B.**      **Stewart's Application for NFL Plan Benefits**

Stewart applied to the NFL Plan for disability benefits on or about October 27, 2008.  The NFL Plan required Mr. Stewart to be examined by Dr. Robert Meek, a "neutral physician" selected by the NFL Retirement Plan.  Dr. Meek was not Stewart's treating physician.  All of Mr. Stewart's injuries and surgeries are documented and were reviewed by Dr. Meek.  Dr. Meek examined Stewart thoroughly and prepared a written report for the NFL Plan stating that "genuinely disabled for any reasonable occupation for which he has the training."  *See* Exhibit 1 at 4.

Mr. Stewart's claim was reviewed the NFL Plan's Initial Claims Committee (the "Committee").  On or about January 25, 2009, the Committee concluded that Mr. Stewart was "totally and permanently disabled" as defined by the NFL Plan.  The Committee determined, however, that Stewart's disability did not arise out of "League football activities."  Hence, he was eligible for Inactive disability benefits rather than Football Degenerative benefits.  Monthly

---

[1] Stewart's playing history and injuries are recounted in the report of Dr. Robert Meek, the "neutral physician" selected by the NFL Plan to review Stewart's claim.  *See* Exhibit 1.  The NFL Plan accepted Dr. Meek's report and opinion in reaching the conclusion that Stewart was "totally and permanently disabled" under the terms of the NFL Plan.

payments for inactive benefits are $4,000 while monthly payments for Football Degenerative benefits are $9,167.[2]  Stewart appealed to the NFL Plan's "Retirement Board."

The Retirement Board denied Stewart's appeal on or about August 18, 2009.[3]  The Retirement Board concluded that Stewart's disabilities did not arise out of League football activities, without any substantive explanation or discussion of Dr. Meek's specific findings.  *See* Exhibit 2.

In connection with his appeal, Stewart, by counsel, contacted Dr. Meek to provide an additional statement on the issue of whether Stewart's disabilities were related to his employment with the NFL teams, without regard to Mr. Stewart's CFL injuries.  Dr. Meek, however, declined to provide additional information because the NFL Retirement Plan prohibits the neutral physicians from communicating with the player or the player's counsel.  *See* Exhibit 3.  In the appeal letter, Stewart specifically asked the Retirement Board to contact Dr. Meek if the Board could not determine whether Mr. Stewart's NFL injuries were disabling without regard to the CFL injuries.  *See* Exhibit 4.  Nevertheless, the Retirement Board did not contact Dr. Meek and denied the appeal.  This lawsuit followed.

    **C.**    <u>**The Remand**</u>

On March 3, 2010, counsel for Stewart issued deposition notices for two of the Retirement Board members who were involved in denying Stewart's claim for Football Degenerative benefits, one who was appointed by the NFL and one who was appointed by the NFLPA.  The NFL Plan has never identified any of the Retirement Board members involved in the review of Stewart's claims; hence, the deposition notices were issued to "John Doe 1" and

---

[2] Stewart's Inactive disability benefit is smaller than the standard $4,000 per month because he accepted an early retirement benefit.

[3] The Retirement Board is also a defendant in this case.

"John Doe 2." *See* Exhibit 5. Shortly thereafter, NFL Plan agreed to a remand to reconsider the appeal, in conjunction with an additional medical review focused on whether Stewart is totally and permanently disabled based on his NFL injuries, without regard to his CFL injuries. Stewart reserved his right to seek depositions following the NFL Plan's reconsideration of the appeal, however. On April 8, 2010, the Court entered a stipulation remanding Stewart's claim to the Retirement Board to reconsider the appeal.

> **D.   The Medical Evidence on Remand and the Curious Case of Dr. Bach and Dr. Haas**

At this point, the simplest and most straightforward way of determining whether Stewart's disability could be attributed to the NFL injuries alone would be to ask Dr. Meek to clarify his opinion, as Stewart had requested months before in connection with his appeal. The NFL Plan, however, insisted that needed both Dr. Meek's clarification and an opinion from Dr. Bach, who regularly consults for the NFL Plan. The written record of that process, however, does not adequately reflect all of the information this Court should have in its possession when it comes time to render a decision.

In a letter dated April 29, 2010, Dr. Meek opined that Stewart's NFL injuries "would have left him disabled, even if hadn't played in the CFL." *See* Exhibit 6. Dr. Bach, without examining Stewart, opined that the "NFL-related injuries would not qualify him for total and permanent disability benefits. *Id.* The NFL Plan then asked each doctor to review and comment on the opinion of the other. Dr. Meek reiterated his view that Stewart's NFL injuries were the cause his disability. *See* Exhibit 7. Dr. Bach, however, seemed confused about the task presented to him. He opined in a letter dated May 27, 2010 that Stewart was not totally and permanently disabled even though the Retirement Board was only examining the cause of Stewart's disability, not whether he was, in fact, disabled. *Id.* Given that Dr. Bach appeared

5

confused about what he had to decide, the Retirement Board should have ruled in favor of Stewart. Instead the Retirement Board determined that it was necessary to reach out to Dr. Bach for still another opinion. *See* Exhibit 8. *This was done without the knowledge of Stewart or his counsel.*[4]

Paul Scott, a functionary of the NFL Plan and the Retirement Board, prompted Dr. Bach to restate his opinion. *Id.* Scott wrote: "This is an unusual case and the Retirement Board needs your expertise." Dr. Bach replied on August 4, 2010, that "none of [Stewart's NFL injuries] individually or collectively would qualify him for total and permanent disability." *Id.* There is no record of any meetings or discussions of the Retirement Board that led to Scott's request. If the Board met or communicated by email or telephone, this would have been outside the scheduled meeting of August 18, 2010.

Having obtained the opinion from Dr. Bach on August 4, the Retirement Board met on August 18. The Retirement Board, whose members remain anonymous, issued a final decision on August 30, 2010 denying the claim for Football Degenerative benefits. *See* Exhibit 10. Dr. Bach's confused opinion letter of May 27 is not mentioned in the Retirement Board's summary of the documentation that it reviewed.

Incredibly, the Board "found it difficult to believe that a reliable opinion on the issue presented here could be based on large part on an examination of Mr. Stewart's condition today."

---

[4] In *Grant v. Bert Bell/Pete Rozelle NFL Players Retirement Plan,* No. 1:09-CV-1848, (N.D. Ga, Sept. 21, 2010), the district court was "troubled" that the NFL Plan did not disclose to Grant and his counsel a report from Dr. Bach obtained before the Retirement Board considered the appeal. *See* Exhibit 9 at 19, n. 17. While the *Grant* court concluded that such a practice did not appear to violate ERISA under 11th Circuit precedent, the legality of the NFL Plan's practice of concealing information does not mean that discovery is barred. To the contrary, the Retirement Board's repeated use of *ex parte* communications with Dr. Bach to create a basis for denying benefits underscores the importance of permitting discovery so that all material facts are available to the plaintiff and this Court.

*Id.* at 4.  This a baffling statement considering that the claim is for Football *Degenerative* benefits which plainly implies that the player's condition over time has degenerated such that injuries that previously did not impair the ability to work were now causing disability.  Furthermore, the Retirement Board simply ignores that Dr. Meek's opinion was based on both his evaluation of Stewart's current condition and the historical medical information.

Instead, The Retirement Board complained that the "tone" of Dr. Meek's June 7 letter was "unprofessional" and therefore, the Board doubted his impartiality and the reliability of his conclusions.  The Retirement Board attacked Dr. Meek for stating in his letter that Dr. Bach "correctly . . . reported his conflict of interest."  *Id.* at 4.  According to the Retirement Board, Dr. Meek was "wrong" and possibly acting in an "intentionally misleading" manner.  *Id.*  Indeed, the Retirement Board went out of its way in the August 30, 2010 decision letter to defend its relationship with Dr. Bach and Dr. Bach's credibility while attacking Dr. Meek.  *Id*. at 3-4.  Dr. Meek, of course, was selected by the NFL Plan as a neutral physician and the conclusions he reached were in response to a request from the Retirement Board for additional information.  So it appears, at this juncture, that what the Retirement Board really objected to was the substance of Dr. Meek's conclusion.

Ironically, less than a month after the Retirement Board issued its decision, a federal district court held that the Retirement Board's decision to deny benefits was "wrong" because it relied on a flawed opinion of Dr. Bach.  *Grant v. Bert Bell/Pete Rozelle NFL Players Retirement Plan,* No. 1:09-CV-1848, (N.D. Ga., Sept. 21, 2010) at 19 (attached as Exhibit 9).  After the Retirement Board asked Dr. Bach to "reexamine" an earlier opinion, Dr. Bach issued a revised opinion that refused to apply NFL Plan guidelines for rating impairments.  Nevertheless, the

7

Retirement Board ignored "Dr. Bach's purposeful disregard" for the rating system and ruled against the player. *Id.*

The Retirement Board clearly has a special relationship with Dr. Bach. The Retirement Board habitually seeks his opinion and will follow-up with Dr. Bach until it receives precisely the opinion that it seeks: the player does not qualify for benefits at all, or at best, qualifies only for the lowest level of benefits. It is simply unfair that the Retirement Board worked with Dr. Bach in secret to obtain opinion that was unfavorable to Stewart without at least asking Dr. Meek for further comment.

The Retirement Board, however, had no qualms about consulting with Dr. Haas, the NFL Plan's Medical Director who, mysteriously, happened to be present at the August 18 meeting to decide Stewart's claim. Yet, Section 11.15 of the NFL Plan document specifically prohibits the Board from seeking the opinion of the Medical Director to determine the disability of any particular player:

> The Medical Director will not examine Players *and will not decide or recommend whether a particular player qualifies for a disability benefit*.

*See* Exhibit 11 at AS000430 (emphasis added). Dr. Haas dismissed Dr. Meek's opinion that the NFL injuries caused Stewart's disability, even though Dr. Meek was an NFL Plan approved neutral physician and the only physician who examined Stewart and understood his current physical condition. The Retirement Board ultimately "relied upon the unequivocal views" of Dr. Haas to deny Stewart's claim in violation of the Plan's specific prohibition on using the Medical Director for such purposes. *See* Exhibit 10 at 4. The Retirement Board purposefully disregarded the requirements of the NFL Plan in its drive to find a reason to deny Stewart's claim for Football Degenerative benefits.

In short, the handling of Stewart's claim has raised many questions that cannot be answered simply by looking at the documents produced by the NFL Plan. For example:

- Why did the Board not contact Dr. Meek for additional clarification regarding Dr. Bach's possible conflict of interest? Why was Dr. Bach given an opportunity to amend an earlier opinion, but not Dr. Meek?

- Who authorized Paul Scott to secretly contact Dr. Bach for a third time or why that communication was not disclosed to Stewart?

- Did the Board acted unanimously or were there differing views on the credibility of Dr. Meek and Dr. Bach?

- Why did the Board conclude that it could determine a claim for Football *Degenerative* benefits based solely on the type of injury suffered by the player not by the degenerative affect of the injuries over time on the players?

- Why was the opinion of an examining physician who reviewed all of the records of Stewart's injuries not considered meaningful in determining the cause of Stewart's disability.

- Were there any questions or concerns of the Board members with the process or any concern about relying on Dr. Haas in violation of the Plan Document? The record is devoid of any notes or summaries of such questions.

- Was the decision to deny Stewart's claim influenced by the substantial difference in payments due for Football Degenerative benefits as compared to Inactive disability benefits?

- What are the actuarial assumptions for number of claims made and percentage claims approved and denied in each category of disability benefit?

- Who were the members of the Retirement Board that decided Stewart's claim? Was the vote unanimous? If there were dissenters, what was the basis of the dissent?
- Did the Retirement Board have discussions with representatives of the NFLPA or NFL before deciding this claim?

The absence of this information prejudices Stewart's ability to challenge the denial of his claim for Football Degenerative benefits. The NFL Plan will not permit depositions of the Retirement Board members without a court order. As next discussed, ERISA permits discovery under these circumstances.

### III.    STEWART'S REQUESTED DISCOVERY IS PERMITTED UNDER ERISA

#### A.    Discovery is Necessary to Complete the Administrative Record

Generally, a plan administrator's denial of benefits is unreasonable unless the decision results from a "deliberate, principled reasoning process" and is supported by substantial evidence. *Guthrie v. Nat'l Rural Elec. Coop. Assoc. Long-term Disability Plan,* 509 F.3d 644, 651 (4th Cir. 2007); *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). Thus, at a later stage in this litigation, the Court will need to review the decision of the Retirement Board to determine whether the Board's denial of Stewart's claim for Football Degenerative benefits was the outcome of a "deliberate, principled reasoning process." To that end, the Court must know all of "facts known to the [Retirement Board] at the time" the decision was made. *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 123 (4th Cir. 1994). If facts are omitted from the administrative record submitted to the Court by the Defendants, the Court will not be able to evaluate the reasonableness of the decision. That is precisely what will occur here if Stewart's request for depositions is denied. There are material facts which are not contained in

10

the documents contained in the NFL Plan file for Stewart's claim that can be obtained only through depositions.

### B. Discovery is Necessary to Determine the Extent of the Retirement Board's Conflict of Interest

Moreover, under the Supreme Court's decision in *Metro. Life Ins. Co. v. Glenn,* 128 S. Ct. 2343, 2350-51(2008), a plan administrator's conflict of interest must be weighed as one factor in determining whether the decision was unreasonable. If the plan administrator both evaluates claims for benefits and pays for those claims, a conflict exists. *Id.* at 2348. In *Glenn,* the insurance company that paid the claims also administered them and thus there was a conflict between its fiduciary responsibilities and its financial interests. The same analysis applies to the NFL Plan, even though there are representatives of both the employer (the NFL) and the players (the NFLPA). *Durakovic v. Building Service 32 BJ Pension Fund et al.,* 609 F.3d 133, 139 (2d Cir. 2010). The *Durakovic* court explained:

> An administrator organized pursuant to 29 U.S.C. § 186(c)(5) should be treated no differently. Here, as in *Glenn*, the evaluation of claims is entrusted (at least in part) to representatives of the entities that ultimately pay the claims allowed. *Cf.* 128 S.Ct. at 2348. This is precisely the type of interest conflict to which Glenn applies: The employer representatives have fiduciary interests that weigh in favor of the trusts' beneficiaries on the one hand, but representational and other interests that weigh to the contrary. *Cf. id*. That the board is (by requirement of statute) evenly balanced between union and employer does not negate the conflict. The existence of union representation should be considered, as the district court concluded, at Glenn's second step. And that the administrator is here a trust, rather than the employer itself or a third-party for-profit institution, does not control. *The rejection of claims will reduce future employer contributions.* . . . All but one of the purportedly contrary persuasive opinions cited by the Funds are non-precedential, outdated (pre-Glenn), or both.

*Id.* at 139. Indeed, one of the cases which the *Durakovic* court determined was outdated was *Johnson v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 468 F.3d 1082, 1086 (8th Cir.2006).

If the NFL Plan were obligated to pay Stewart Football Degenerative benefits, it would be responsible for paying hundreds of thousands of dollars more than currently projected. *See* Exhibit 11 at AS000431(plan assumes football related disability rate of 0.10% for Active football players and 0.08% for retired players until age 45 after which the rate is zero). And Stewart is not the only former player seeking disability benefits. So if the NFL Plan were to approve a larger percentage of claims, the NFL teams could be required to increase their contributions to the Plan. Furthermore, even the presence of NFLPA representatives on the Retirement Board does not necessarily balance out the conflict of the NFL employer representatives. The NFLPA represents active players, not retired players. Contributions from the NFL to the NFL Plan to fund disability benefits are not available to pay the salaries and benefits of active players. In sum, like the pension fund in *Durakovic*, the NFL Plan suffers from a conflict that is properly the subject of discovery.

    **C.**    **The Scope of Discovery**

The Supreme Court has counseled against applying special procedural and evidentiary rules to ERISA cases. *Id*. at 2351. Thus, the "familiar standards of Federal Rule of Civil Procedure" govern Stewart's request for discovery. *Murphy v. Deloitte & Touche Group Insurance Plan*, 2010 WL 3489673 (10th Cir. 2010). Under Rule 26, Stewart may obtain discovery regarding any nonprivileged matter that is relevant to his claim for Football Degenerative benefits.

This Court should permit Stewart to depose one member of the Retirement Board who was appointed by the NFL and one member who was appointed by the NFLPA. Stewart needs the requested depositions to complete the administrative record and to determine the extent of the Retirement Board's conflict of interest and how that conflict of interest affected the decision to deny Stewart's claim. This additional information will facilitate the Court's determination of whether the Retirement Board's decision was reasonable and the product of a "full and fair review" process as mandated by ERISA, 29 U.S.C. §1133(2).

### IV.     CONCLUSION

For the reasons stated above, the Court should permit Stewart to conduct the requested depositions.

                                    Respectfully submitted,

Dated: November 8, 2010      By:      /s/ Kelly M. Lippincott
Kelly M. Lippincott, Esq. (Federal Bar No. 15931)
Carr Maloney P.C.
2000 L Street, N.W.
Suite 450
Washington, DC 20036
Tel. 202-310-5591
Fax 202-310-5555
kml@carrmaloney.com

Michael H. Rosenthal, *pro hac vice*
Rosenthal Lurie LLC
Two Penn Center
1500 JFK Blvd., Suite 1230
Philadelphia, PA 19102
Tel. (215) 496-9404
Fax (215) 600.1728
Michaell@RosenthalLurie.com
*Counsel for Plaintiff Andrew Stewart*

**CERTIFICATE OF SERVICE**

I herby certify that the foregoing Memorandum of Law in Support were e-filed and electronically served this 8th day of November, 2010 on the following:

>Hisham M. Amin, Esq.
>Groom Law Group
>1701 Pennsylvania Ave., N.W.
>Washington, DC 20006
>
>HAmin@Groom.com

>/s/ Kelly M. Lippincott
>Kelly M. Lippincott