IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

ANDREW STEWART,

       Plaintiff,

            v.               CIVIL NO.: WDQ-09-2612

BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN, *et al.,*

       Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

Andrew Stewart sued the Bert Bell/Pete Rozelle NFL Player
Retirement Plan ("the Plan"), the Plan's Retirement Board ("the
Board"), and the NFL Player Supplemental Disability Plan ("the
Supplemental Disability Plan") for violating the Employee
Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§
1001 *et seq.* For the following reasons, the Defendants' motion
for summary judgment will be granted in part, and denied in
part, and Stewart's motion for summary judgment will be denied.

I.    Background[1]

    A.    The Plan

The Plan provides retirement, disability, and related
benefits to eligible National Football League ("NFL") players

---

[1]  On cross-motions for summary judgment, "each motion [is]
considered individually, and the facts relevant to each [are]
viewed in the light most favorable to the non-movant." *Mellen
v. Bunting,* 327 F.3d 355, 363 (4th Cir. 2003).

and their beneficiaries. Admin Rec. 387. Under Article 5 of the Plan, a covered player who becomes "totally and permanently" disabled is eligible to receive "a monthly total and permanent disability ("T&P") benefit." Admin Rec. 404. The Plan offers four types of T&P benefits:

> (a) Active Football. The monthly [T&P] benefit will be no less than $4,000 if the disability(ies) results from [NFL] football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled 'shortly after' the disability(ies) first arises.
>
> (b) Active Non-football. The monthly [T&P] benefit will be no less than $4,000 if the disability(ies) does not result from [NFL] football activities, but does arise while the Player is an Active Player and does cause the Player to be totally and permanently disabled 'shortly after' the disability(ies) first arises.
>
> (c) Football Degenerative. The monthly [T&P] benefit will be no less than $4,000 if the disability(ies) arises out of [NFL] football activities, and results in total and permanent disability before fifteen years after the end of the Player's last Credited Season.
>
> (d) Inactive. This category applies if (1) the total and permanent disability arises from other than [NFL] football activities while the Player is a Vested Inactive Player, or (2) the disability(ies) arises out of [NFL] football activities and results in total and permanent disability 15 or more years after the end of the Player's last Credited Season.

*Id.* 404-405.[2]

---

[2]  Under the Plan, a disability "arises out of [NFL] football activities" when it "arises out of any [NFL] pre-season, regular season, or post season game, or any combination thereof, or out of [NFL] football activities supervised by an Employer, including all required or directed activities." Admin. Rec.

T&P benefits claims are first reviewed by the Plan's Disability Initial Claims Committee ("the Committee"). *Id.* 418-19. The Committee's decision may be appealed to the Board. *Id.* 417. The Board has six voting members; three who are appointed by the NFL Players Association, and three appointed by the NFL Management Council. *Id.* 416. The Plan gives the Board "full and absolute discretion, authority and power to interpret, control, implement, and manage the Plan." *Id.*

B.  Stewart's Professional Football Career

Stewart is a former NFL player. Pl.'s Mot. Summ. J., Ex. 1 at 3. In 1989, he was drafted by the Cleveland Browns as a defensive end. *Id.* In 1990, he stepped in a hole during summer training camp and "felt a 'pop' in his right Achilles[] tendon." *Id.* His right Achilles tendon was partially torn, and Stewart was immobilized and required to wear "a boot." *Id.*

In 1991, Stewart joined the Cincinnati Bengals. *Id.* During a Bengals practice, he "took a chop block to his left knee and was taken off the field." *Id.* He was diagnosed with a torn left anterior cruciate ligament ("ACL") and a torn lateral meniscus. *Id.* On August 14, 1991, Dr. Height, the Bengals'

---

413.  "'Arising out of [NFL] football activities' does not include . . . any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than [NFL] football activities." *Id.*

team physician, performed surgery on Stewart's left knee. *Id.* After the surgery, Stewart had "extensive rehabilitation," and missed the remainder of the 1991 and 1992 seasons. *Id.*

When his contract with the Bengals ended, Stewart was signed by the San Francisco 49ers. *Id.* In 1993, Stewart injured his right hand during a 49ers pre-season game in Barcelona, Spain. *Id.* His hand was x-rayed in Barcelona and injected with a local anesthetic. *Id.* at 3-4. About 10 days later, Stewart returned to San Francisco, and was seen by Dr. Gordon Brody. *Id.* at 4. His right hand was "very swollen," and Dr. Brody diagnosed Stewart with "a 10 day old complex closed intra-articular fracture." *Id.* On August 19, 1993, Dr. Brody performed a two-hour surgery to repair the fracture, which was complicated by the delay between the injury and treatment. *Id.*

Stewart missed the 1993 season, and joined the Canadian Football League ("CFL") in 1994. *Id.* In December 1996, Stewart had surgery on his right knee and "was recorded to have osteoarthritis in th[at] knee." *Id.* In 1997, while playing for the Toronto Argonauts, Stewart injured his right elbow. *Id.* He was diagnosed with a "partial tear or hematoma in the right triceps with a large olecranon bursitis." *Id.* The bursitis was excised. *Id.* In September 1998, Stewart had a second surgery on his left knee. *Id.*

After that surgery, Stewart retired from football, but rejoined the Argonauts in 2000. *Id.* That year, Stewart tore his distal right quadriceps tendon at training camp. *Id.* The injury ended his career. *Id.* Stewart remained in Canada with his wife, and attempted to obtain a job in criminal justice, which he had studied in college. *Id.* Unable to pass required physical exams, Stewart found work at a friend's landscape design business. *Id.* In 2003, Stewart resigned because he was unable to stand for long periods. *Id.* He has been unemployed since. *Id.*

C. Stewart's Application for Benefits

On October 27, 2008, Stewart applied to the Plan for T&P benefits. Pl.'s Mot., Ex. 2 at 1. In his application, Stewart stated that since 2002 he had been unable to work because of "constant pain due to injuries." *Id.* at 2. On November 5, 2008, the Plan informed Stewart that he was "required to be evaluated by a neutral physician." *Id.* at 9. Because Stewart refused to leave Canada, the Plan arranged for Dr. Robert Meek, a Canadian orthopaedic doctor, to examine him. Admin. Rec. 491.

Dr. Meek examined Stewart on January 14, 2009. Pl.'s Mot., Ex. 1. Dr. Meek noted that Stewart's left knee was in "constant pain," and he could not squat. *Id.* at 4. He had "difficulty getting out of a chair" and "[s]tairs [were] hard to negotiate." *Id.* Dr. Meek determined that Stewart's left knee "flexe[d] to

about 100 degrees," but it "seem[ed] quite painful" to flex
further. *Id.* at 5. He noted that Stewart had "patellofemoral
crepitus and palpable osteophytes on the upper tibia," and bone
spurs in his knee. *Id.* He had some tenderness, scarring, and
numbness "related to the staple from his ACL reconstruction."
*Id.* An x-ray showed "a staple and a screw in the femur and the
tibia . . . from the ACL repair of the left knee." *Id.*

After examining Stewart's right arm, Dr. Meek opined that
it was "weak at the elbow particularly in extension." *Id.*
Stewart could not "do anything vigorous or precise with his
right hand because of pain, weakness and inability to fully . .
. flex his right index finger." *Id.* Stewart had a "palpable
defect in the triceps . . . and a bulge in the proximal
triceps." *Id.* He had "mild osteoarthritis with a loose body of
small fragment" at the right elbow, and his "right 2nd
metacarpophalangeal joint (MCP) ha[d] a scar over it." *Id.*
Stewart could "only flex at the MCP to about 85 degrees." *Id.*
He had "particular weakness of the flexor digitorum profundus."
*Id.* An x-ray of Stewart's right hand showed "a healed fracture
of the distal 2nd [MCP] with 2 small screws in place." *Id.*

Dr. Meek opined that "over a football career in the NFL and
the CFL," Stewart had suffered "injuries which . . . left him
with pain and disability in three of his four extremities."

*Id.*[3] His surgeries had "mitigate[d] or cure[d] these injuries with only partial success." *Id.* Dr. Meek concluded that Stewart was "genuinely disabled." *Id.* He stated that Stewart "may benefit to some degree from removal of the metal from his right hand and from his left knee area," and might be "more comfortable . . . if he had a successful total knee replacement on the left knee," but these surgeries would not make him employable. *Id.*

On February 3, 2009, the Committee approved Stewart's T&P benefits claim, but awarded him only "Inactive" T&P benefits because it "found that [Stewart's] disabling condition(s) did not arise out of [NFL] football activities." Admin. Rec. 291-293. The Committee provided no explanation of how or why it reached that conclusion. *See id.* On July 15, 2009, Stewart appealed the Committee's determination to the Board, requesting Football Degenerative T&P benefits. *See id.* 310-314.

In his appeal, Stewart argued that his left knee and right hand were disabled as "the direct result of his employment with NFL teams," and "there [was] no factual basis for a determination that th[ose] injuries would not be disabling but

---

[3] Dr. Meek had also noted that Stewart had "weakness of the right calf" and was unable to "do a toe raise on that side." Pl.'s Mot., Ex. 1 at 5. He had "a moderately stiff neck with about half the normal expected motion but . . . no neck pain or tenderness. His shoulders both move[d] well and ha[d] no weakness. His left upper extremity [was] normal." *Id.*

for the [other] CFL injuries." *Id.* 313. Stewart requested that
the Board contact Dr. Meek if it needed clarification of his
report, and stated that "implicit in [the] report is [Dr.
Meek's] opinion that the NFL related disabilities . . . *by
themselves* . . . prevent[ed] [Stewart's] gainful employment."
*Id.* 313-314 (emphasis in original).

Without contacting Dr. Meek, the Board affirmed the
Committee's decision on August 18, 2009. *See id.* 317. On
October 6, 2009, Stewart sued the Defendants for denial of ERISA
benefits, and breach of fiduciary duty. ECF No. 1. On April 5,
2010, the parties filed a joint stipulation agreeing to remand
Stewart's claim for reconsideration by the Board. ECF No. 12.
This Court approved the stipulation on April 8, 2010, and
ordered the parties to submit a status report within 30 days
after the Board issued its remand decision.    ECF No. 13.

On April 15, 2010, Paul Scott, a Plan benefits coordinator,
asked Dr. Meek to submit a letter clarifying "whether Mr.
Stewart would be totally and permanently [disabled] if he had
not played in the CFL." Pl.'s Mot., Ex. 8 at 1. On April 19,
2010, Scott asked Dr. Bernard R. Bach, an orthopaedic surgeon
who sometimes acted as a "Medical Advisory Physician" for the

Board,[4] to review Stewart's medical records and give his opinion about the claim. *Id.* at 6.

Dr. Bach submitted his opinion on April 24, 2010. *Id.* at 2-4. He stated that he had been "simply asked to review [Stewart's medical records] with regards to whether [his] NFL-related injuries would be consistent with the criteria for total and permanent disability." *Id.* at 3. Based on his review, and without "personally review[ing] any radiographs" or "examin[ing] the patient," Bach determined that the injuries Stewart sustained in the NLF "would not qualify him for total and permanent disability." *Id.*

Dr. Bach explained that the NFL-related injuries were to Stewart's "left knee with an ACL injury and partial meniscectomy, a right ankle partial Achilles tendon rupture, and a right hand second metacarpal fracture." *Id.* at 2. He stated that after Stewart's second left knee surgery in 1998, a "very brief operative report" stated that "the knee was stable, that the patellofemoral joint was normal, that the medial compartment

---

[4] Under the Plan, Medical Advisory Physicians made determinations on "medical issues submitted by the Retirement Board," and based on their "review [of] all material submitted to the Plan" and additional consultations they deemed necessary. Admin. Rec. 423-24. Under Section 8.3 of the Plan, the Board, if deadlocked, could "submit [its] dispute[] to a Medical Advisory Physician for a final and binding determination regarding such medical issues." *Id.* 418. It does not appear that Bach was acting as a Medical Advisory Physician in the capacity described in Section 8.3 when he was consulted about Stewart's condition. *See id.* 490.

was examined and looked 'fine,' the lateral compartment had a
degenerative type tear of the lateral meniscus which was
debrided, and the articular surfaces of the femur and tibia were
still 'reasonably good.'" *Id.* He noted that the records
indicated that the right Achilles tendon injury was "not a
complete injury" and had been "treated nonsurgically," and
Stewart had "underwent open treatment of a complex closed
articular facture of the metacarpal head and neck" at Stanford
University in 1993. *Id.* Dr. Bach also stated that he was a
"Medical Advisory Physician[] for the [Plan]," but that any
opinions rendered as to whether a player qualified for benefits
were given "independent of . . . whether [the opinions would]
qualify a player for [particular] disability benefits." *Id.* at
4.

On April 29, 2010, Dr. Meek submitted a letter clarifying
his opinion. Pl.'s Mot., Ex. 8 at 1,5. His letter stated:

> Mr. Stewart clearly developed significant injuries
> while playing in both the CFL and the NFL. His left
> knee seems to be one of the major sources of
> disability and it certainly has major post-traumatic
> arthritis. This is the knee he injured when
> practicing for the Bengals . . . As well, he still has
> some disability related to the right hand finger
> injury, which [occurred] when he was with the 49ers.
> You will recall that this injury was missed at a pre-
> season game in Barcelona, Spain and not diagnosed and
> treated for 10 days. It is true that he suffered a
> significant elbow injury and right knee injury when
> playing in the CFL as well . . . It is always hard to
> decide which of a series of injuries are the
> 'disabling' one[s]. On balance, I think his left knee

10

and right hand injuries would have left him disabled,
even if he hadn't played in the CFL.

*Id.* at 5.

In May 2010, Scott requested that Dr. Bach and Dr. Meek
review each other's opinions and provide their "complete and
final opinion[s] on the matter." Pl.'s Mot., Ex. 9 at 1-2.
On May 27, 2010, Dr. Bach responded:

> As you know, the issue in this situation is not
> whether Mr. Andrew Stewart meets the criteria for line
> of duty disability; it is whether he is totally and
> permanently disabled. My understanding of this
> definition . . . is whether an individual is . . .
> unable to perform any line of work. Based on this, in
> my opinion, Mr. Andrew Stewart is not totally and
> permanently disabled.

*Id.* at 3.

On June 7, 2010, Dr. Meek responded:

> I appreciate the difficulty you have in determining
> the permanent disability status of a player who was
> injured in two different settings, the NFL and CFL. I
> also appreciate the difficulty Dr. Bach faces in
> making this determination with only records to review
> and without the chance to see and examine the patient
> and his [x-rays]. I feel that talking to and
> examining the patient and personally reviewing the [x-
> rays] adds significantly to my ability to assess
> patients.
>
> Mr. Stewart clearly developed significant injuries
> while playing in both the CFL and the NFL. His left
> knee (the one injured and treated when he was with the
> Bengals) seemed to be one of the major sources of
> disability and it certainly had major post-traumatic
> arthritis. The subsequent surgery he had on his left
> knee when he was in the CFL was, in my view, clearly
> related to his original left knee injury sustained in
> Cincinnati. As well, he had some disability related
> to the right hand finger injury, which was repaired at

11

Stanford when he was with the 49ers. My final opinion
has not changed . . . It is always hard to decide
which of a series of injuries are the 'disabling'
ones. On balance, I think his left knee and right
hand injuries would have left him disabled, even if he
hadn't played in the CFL.

Pl.'s Mot., Ex. 9 at 4.

Dr. Meek also stated that Dr. Bach's April 24, 2010 report

"correctly . . . reported his potential conflict of interest

[because] he is one of the Medical Advisory Physicians for the

[Plan]." *Id.* Dr. Meek said that he "ha[d] no likely conflicts

of interest and ha[d] not been associated with the NFL or the

NFL Players Association." *Id.*

On August 2, 2010, Scott sought further clarification from

Dr. Bach:

This is an unusual case and the Retirement Board needs
your expertise. Please help us by reviewing the
following and providing comment and clarification as
appropriate:

1. We have been unable to obtain copies of Mr.
Stewart's x-rays discussed in Dr. Meek's report.
Please address whether your assessment of Mr. Stewart's
case would be better substantiated if you could review
those x-rays.

2. In your correspondence you state that "the issue in
this situation is not whether Mr. Andrew Stewart meets
the criteria for line of duty disability; it is whether
he is totally and permanently disabled." That is
incorrect. We asked you to assume that Mr. Stewart is
totally and permanently disabled. The question is,
given that assumption, whether Mr. Stewart is totally
and permanently disabled due to NFL football
activities.

3.  We need you to address in detail this issue of
whether Mr. Stewart would be totally and permanently
disabled based on his NFL football activities only.  In
your letter of 4/24/2010 you state that Mr. Stewart's
NFL-related injuries were to his left knee with an ACL
injury and partial lateral meniscectomy, a right ankle
partial Achilles tendon rupture, and a right hand
second metacarpal fracture requiring surgery.
Please explain . . . (i) how you believe each of these
impairments would likely have evolved had Mr. Stewart
NOT played in the CFL (ii) the likely cumulative effect
of these NFL-only injuries today, and (iii) whether
these NFL injuries by themselves would likely have
rendered him totally and permanently disabled.

Pl.'s Mot., Ex. 10 at 1.

On August 4, 2010, Dr. Bach wrote to Scott that Stewart was

"not totally and permanently disabled due to NFL football

activities," and review of the x-rays would "not affect [his]

opinions." *Id.* at 2.  He stated that neither "[t]he left knee

ACL and partial lateral meniscectomy," nor the "right ankle

partial Achilles tendon rupture," would qualify Stewart "for

total and permanent disability." *Id.*  The right hand metacarpal

fracture did not disable Stewart, and "[c]umulatively, these

three issues would not qualify him for total and permanent

disability. *Id.*  Dr. Bach also stated:

Clearly Dr. Meek does not understand the collective
bargaining process and collective bargaining
agreements.  Also of interest is the final paragraph
[of his opinion] that indicated that I had a potential
conflict of interest . . . In fact, I have no specific
conflict of interest because I am paid independent of
the opinions that I render and this is specifically
explained to each and every patient that I see as a
Medical Advisory Physician.

13

*Id.*

On August 18, 2010, the Board reconsidered Stewart's claim, and affirmed its decision that he was ineligible for Football Degenerative T&P benefits. Pl.'s Mot., Ex. 11. At the meeting, the Board noted that the opinions of Dr. Meek and Dr. Bach conflicted. *Id.* at 1-3. The Plan's Medical Director,[5] Dr. Stephen Haas, was at the meeting, and the Board "asked for his views on the matter." *Id.* at 3. Dr. Haas "reviewed the conflicting letters and medical reports," and stated that "the matter is 'not even close'"; "Stewart's injuries suffered during his NFL career did not produce total and permanent disability." *Id.* at 3.

In deciding that Stewart was not entitled to Football Degenerative benefits, the Board "took the following facts into account":

> Dr. Bach is one of the most respected physicians in the Plan's network . . . Where appropriate the Board asks him to act as a Medical Advisory Physician . . . The Board trusts Dr. Bach's judgment completely; when Dr. Bach acts as a MAP his decisions are 'final and binding' upon the Board . . . Dr. Bach's credentials are impeccable . . . In contrast, Dr. Meek has no

---

[5] The Plan provides for appointment of a Medical Director who will give medical advice with respect to the Plan's neutral physicians and medical examination procedures." Admin. Rec. 430. The Medical Director "will provide advice on medical issues relating to particular disability benefit claims as requested by members of the [Board] or a member of the [Committee]." *Id.* "The Medical Director will not examine Players, and will not decide or recommend whether a particular Player qualifies for a disability benefit." *Id.*

14

> history or relationship with the Plan other than in
> this case . . . Dr. Meek has examined no player other
> than Mr. Stewart on behalf of the Plan.

*Id.* at 3-4.

The Board also discredited Dr. Meek because "the tone" of

his June 7, 2010 letter was "unprofessional" and "cast doubt on

the impartiality and reliability of his conclusion." *Id.* at 4.[6]

The Board noted that "although Dr. Bach did not personally

examine Mr. Stewart, the issue [was] not [Stewart's] current

condition . . . but rather causation." *Id.* The Board

characterized Dr. Meek's opinion as based "in large part" on

"Mr. Stewart's condition today," which it "found . . . difficult

to believe [would produce] a reliable opinion" on that issue.

*Id.*

The Board "relied on the unequivocal views of Dr. Haas"

whose credentials were "even more impressive than Dr. Bach's,"[7]

and on "its own extensive experience in reviewing claims for

disability benefits." *Id.* at 4-5. The Board concluded that it

"could not ignore that Mr. Stewart played in the CFL for at

least four years after his NFL career ended," which "strongly

---

[6] According to the Board, Dr. Meek's statements about Dr. Bach's
conflict of interest were "not only wrong but appear to be
intentionally misleading." Pl.'s Mot., Ex. 11 at 4.

[7] Dr. Haas "has served as an orthopedic consultant to the Social
Security Administration, Department of Commerce, Department of
Labor and the White House. . . . he has treated Presidents of
the United States" and "has decades of experience with
orthopedic injuries of professional athletes." *Id.* at 4-5.

suggest[ed] that his NFL injuries could not, by themselves, have caused total and permanent disability." *Id.*

On September 21, 2010, Stewart submitted a status report informing the Court that the Plan had issued its final denial of his claim, and he wished to proceed with discovery. ECF No. 14. On February 16, 2011, Stewart moved for summary judgment. ECF No. 31. On March 9, 2011, the Defendants filed their motion for summary judgment. ECF No. 32.

II. Analysis

A. Standard of Review

Under Rule 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in h[is] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court

must abide by the "affirmative obligation of the trial judge to
prevent factually unsupported claims and defenses from
proceeding to trial," *Bouchat v. Balt. Ravens Football Club,
Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal
quotation marks omitted).  When cross motions for summary
judgment are filed, "each motion must be considered
individually, and the facts relevant to each must be viewed in
the light most favorable to the non-movant." *Mellen,* 327 F.3d
at 363 (*citing Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th
Cir. 2003)).

    B.    The Defendants' Motion for Summary Judgment

        1.    Denial of Football Degenerative Benefits

    The Defendants argue that they are entitled to summary
judgment on Stewart's denial of benefits claim because the Board
reasonably determined, after a "thorough and principled review,"
that his NFL-related injuries did not render him totally and
permanently disabled. Defs.' Mot. 11-15.  Stewart argues that
the Board improperly relied on Dr. Haas's recommendation, and
arbitrarily discredited Dr. Meek.  Pl.'s Opp'n.  2-8.

    When, as here, an ERISA benefit plan vests the plan
administrator with discretionary authority to make eligibility
determinations, the court reviews the administrator's decision
for abuse of discretion. *Williams v. Metro. Life Ins., Co.,* 609
F.3d 622, 629-30 (4th Cir. 2010).  Under the abuse of discretion

17

standard, the administrator's decision is not disturbed if reasonable, "even if [the court] would have come to a contrary conclusion independently." *Id.* at 630.

A decision is reasonable if it results from a "deliberate, principled reasoning process" and is "supported by substantial evidence." *Frankton v. Metro. Life Ins. Co.,* 2011 WL 1977617, at *3 (4th Cir. May 23, 2011) (internal quotation marks omitted)(*quoting Williams,* 608 F.3d at 630). Substantial evidence is that "which a reasoning mind would accept as sufficient to support a particular conclusion," and "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *LeFebre v. Westinghouse Elec. Corp.,* 747 F.2d 197, 208 (4th Cir. 1984).[8]

---

[8] The Fourth Circuit has identified eight nonexclusive factors that courts may consider in reviewing the reasonableness of an administrator's decision:

(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Frankton,* 2011 WL 1977617 at *4.

a.    Reliance on Dr. Haas

Stewart argues that the Board's reliance on Dr. Haas's

opinion was "contrary to the plain language of the Plan,"

demonstrating that its denial of his claim was unreasonable.

Pl.'s Mot. 11.  The Defendants contend that the Plan's language

allows for consideration of Haas's opinion, and to the extent

the Plan provisions governing Medical Directors are ambiguous,

the Board has the discretion to interpret them.  *See* Defs.' Mot.

13-14.

Section 11.15 (b) governs the role of Dr. Haas as the

Plan's Medical Director:

> The duties and responsibilities of the Medical
> Director will be determined by the [Board], and will
> include medical advice with respect to the Plan's
> neutral physicians and medical examination procedures.
> The Medical Director will provide advice on medical
> issues relating to particular disability benefit
> claims as requested by a member of the [Board] or a
> member of the [Committee].  The Medical Director will
> not examine Player, and will not decide or recommend
> whether a particular Player qualifies for a disability
> benefit.  The Medical Director will not be a Plan
> fiduciary.

Admin. Rec. 430.

"[W]hen the plan's terms are ambiguous in the sense that

its language gives rise to at least two different but reasonable

interpretations and when the plan confers discretion on the

administrator to interpret the plan and resolve ambiguities, a

court defers to the administrator's interpretation by reviewing

19

it only for abuse of discretion." *Colucci v. Agfa Corp. Severance Pay Plan,* 431 F.3d 170, 176 (4th Cir. 2005). But "[i]nterpretive discretion only allows an administrator to resolve ambiguity." *Id.* "Even if the plan generally confers discretion on the administrator to interpret its terms, such discretion does not [allow the administrator] to alter the plan's terms or to read out unambiguous provisions." *Id.*

Section 11.15 (b) plainly does not allow for Dr. Haas, as the Medical Director, to "decide or recommend whether a particular Player qualifies for a disability benefit." It is less clear whether Dr. Haas did this at the August 18, 2010 Board meeting, or whether he only "provide[d] advice on medical issues relating to [Stewart's] disability benefit claim," which is allowed by the Plan.

The Board's final decision states that it "asked for [Dr. Haas's] views," and he "reviewed the conflicting letters [of Dr. Bach and Dr. Meek] and the medical reports" and "stated that Stewart's injuries suffered during his NFL career did not produce total and permanent disability." Admin. Rec. 490. Viewing this final decision in the light most favorable to Stewart, a reasonable fact finder could conclude that Dr. Haas not only provided medical advice, but also recommended that Stewart be denied the benefits he sought. This weighs against the Defendants' motion for summary judgment.

20

b.   Conflicting Medical Opinions

The Defendants argue that "putting Dr. Haas's [opinion]
aside, there is [still] substantial evidence supporting the
Board's determination." Defs.' Mot. 14.  Stewart argues that in
making its decision, the Board selectively relied on Dr. Bach,
who had never examined him, and arbitrarily disregarded Dr.
Meek's opinion, even though he had examined Stewart.  Pl.'s Mot.
12-13.

Plan administrators "are not required to accord any special
deference to the opinions of treating physicians over those of
non-treating consultants." *Hensley v. Int'l Bus. Machs. Corp.,*
123 Fed. Appx. 534, 539 (4th Cir. 2004).  "[C]ourts have no
warrant to require administrators automatically to accord
special weight to the opinions of a claimant's physician; nor
may courts impose on plan administrators a discrete burden of
explanation when they credit reliable evidence that conflicts
with a treating physician's evaluation." *Black & Decker
Disability Plan v. Nord,* 538 U.S. 822, 834 (2003).

However, when a plan administrator denies benefits in the
face of conflicting medical opinions, the conflicting evidence
on which the administrator relies must be substantial.  *Stup v.
Unum Life Ins. Co.,* 390 F.3d 301, 308 (4th Cir. 2004); *Elliott
v. Sara Lee Corp.,* 190 F.3d 601, 606 (4th Cir. 1999).  The
decision "must be based on the whole record and [the plan

administrator] cannot pick and choose evidence that supports its decision while ignoring other relevant evidence" before it. *Mills v. Union Sec. Ins. Co.,* 2011 WL 2036698, at *11 (E.D.N.C. May 24, 2011) (*citing Myers v. Hercules, Inc.,* 253 F.3d 761, 768 (4th Cir. 2001)).

In deciding that it would not rely on Dr. Meek, the Board cited (1) the "unprofessional" tone of his June 7, 2010 letter, (2) Dr. Bach's reputation, and (3) Dr. Haas's recommendation. *See* Admin. Rec. 489-492. It is difficult to understand why the Board was concerned with the "unprofessional" tone of Dr. Meek's letter, but not similarly concerned with Dr. Bach's statement that Dr. Meek "[c]learly . . . does not understand the collective bargaining process and collective bargaining agreements," or Dr. Bach's incorrect statements regarding the questions the Plan had asked him to consider. *See* Pl.'s Mot., Ex. 10 at 1. Additionally, as discussed above, Stewart has shown a genuine dispute about whether Dr. Haas's recommendation was improperly considered, and a reasonable factfinder could conclude from the Board's final decision that Dr. Haas's opinion was not merely "one of many sources of information upon which the [Board] relied," but was treated as a tie-breaker between the other conflicting opinions.[9] Although the Board also stated

---

[9] *Tyson v. Pitney Bowes Long-Term Disability Plan,* 2009 WL 2488161, at *8 (D.N.J. Aug. 11, 2009) (consideration of

22

in its final decision that Dr. Meek was discredited because the Board "found it difficult to believe that a reliable opinion on the issue . . . could be based in large part on an examination of Mr. Stewart's condition today," Dr. Meek, like Dr. Bach, reviewed Stewart's medical history in rendering his initial opinion.[10]

Stewart has produced evidence showing genuine disputes about whether the Board (1) arbitrarily discredited Dr. Meek, and (2) rendered its decision based on an impermissible benefits recommendation from Dr. Haas. Viewing the evidence in the light most favorable to Stewart, a reasonable factfinder could conclude that the Board's decision that he did not qualify for Football Degenerative benefits was not the product of a "deliberate, principled reasoning process." *Frankton*, 2011 WL 1977617 at *3. The Defendants' motion for summary judgment will be denied as to Stewart's denial of benefits claim.

---

materials inconsistent with plan terms did not preclude granting plan summary judgment when the materials were but "one of many sources of information upon which the Committee relied in making its determination," and the properly considered materials were substantial evidence supporting its decision). *See also de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1188 (4th Cir. 1989) (administrator may act unreasonably if it applies the plan in a manner that "render[s] some language in the plan documents 'meaningless'");

[10] *See* Pl.'s Mot., Ex. 1 at 2-6; *Piepenhagen v. Old Dominion Freight Line, Inc. Emp. Benefit Plan,* 640 F. Supp. 2d 778, 787 (W.D. Va. 2009) (distorting statements of treating physician may show unreasonableness of benefits denial).

2. Breach of Fiduciary Duty Claim

Count II of Stewart's complaint alleges that the Board breached its fiduciary duties under 29 U.S.C. § 1104 by failing to contact Dr. Meek "for additional information pertaining to the origin of [Stewart's] disability" before initially denying his Football Degenerative claim. Compl. ¶¶ 47-52.

The Defendants argue that they are entitled to summary judgment on Count II because it is a repackaged denial of the benefits claim that fails as a matter of law. Defs.' Mot. Summ. J. 15. Stewart contends that summary judgment should be denied because he has achieved "some success on the merits" of this claim as the Board did request additional information from Dr. Meek on remand. Pl.'s Opp'n 8.

Section 1104 "cannot independently support a claim of fiduciary duty." *Anderson v. U.S. Bancorp,* 484 F.3d 1027, 1031 (8th Cir. 2007). When a beneficiary seeks benefits that should have been distributed under a plan, the appropriate remedy is a claim for denial of benefits under 29 U.S.C. § 1132 (a)(1)(B), not a fiduciary duty claim. *See Smith v. Sydnor,* 184 F.3d 356, 362 (4th Cir. 1999). "[A] plan beneficiary cannot merely recast a claim predicated upon the fiduciary's alleged mishandling of an isolated claim for coverage in the form of a breach of duty. Rather, [he] must establish a breach of fiduciary duty independent of the contested denial of benefits." *Kopicki v.*

24

*Fitzgerald Auto Family Emp. Benefits Plan,* 121 F. Supp. 2d 467,
483 (D. Md. 2000) (internal citations omitted).

Count II, which arises from the Board's interpretation and
application of the Plan, is a claim for denial of benefits which
Stewart has improperly recast as a claim for a breach of
fiduciary duty. The claim fails as a matter of law, and the
Defendants will be granted summary judgment on Count II.

C.   Stewart's Motion for Summary Judgment

Stewart has moved for summary judgment that the Board's
decision was an abuse of discretion, and he is entitled to
Football Degenerative benefits. ECF No. 31-1 at 9-21. Summary
judgment in Stewart's favor is only appropriate if the evidence
that his disabilities arose out of his NFL-related activities
within the meaning of the Plan is so overwhelming that he is
entitled to judgment as a matter of law.[11] Stewart's evidence,
Dr. Meek's opinion, does not rise to that level. Dr. Meek's
opinion is not unequivocal. Instead, he is clear that the
question is a difficult one.[12] Further, on this record,

---

[11] *Hardt v. Reliance Std. Life Ins. Co.,* 540 F. Supp. 2d 656,
664 (E.D. Va. 2008) (although participant presented "compelling
evidence" of entitlement to benefits, summary judgment was
inappropriate because the evidence was not "so overwhelming that
[she] was entitled to judgment as a matter of law").

[12] *Compare Duperry v. Life Ins. Co.,* 632 F.3d 860, 864-867 (4th
Cir. 2011)(plan participant was entitled to benefits when
treating physician stated that she was "permanently disabled"
and would "never" return to work, she was prescribed

reasonable factfinders could disagree about whether Dr. Haas impermissibly recommended that Stewart be denied Football Degenerative benefits, or only answered medical questions for the Board related to his benefits claim. Accordingly, Stewart's motion for summary judgment will be denied.

III. Conclusion

For the reasons stated above, the Defendants' motion for summary judgment will be granted in part, and denied in part. Stewart's motion for summary judgment will be denied.

_____
Date  2/19/11

_____
William D. Quarles, Jr.
United States District Judge

---

increasingly high dosages of pain killers, and evidence included home DVD showing the severity of her condition which was supported by statements of her relatives and supervisor) *with Hardt,* 540 F. Supp. 2d at 644 (denying summary judgment for participant when treating doctor's opinion was cautious and not definitive).