IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

ANDREW STEWART,

      Plaintiff,

        v.                         CIVIL NO.: WDQ-09-2612

BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN, *et al.,*

      Defendants.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### MEMORANDUM OPINION

Andrew Stewart sued the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("the Plan"), the Plan's Retirement Board ("the Board"), and the NFL Player Supplemental Disability Plan ("the Supplemental Disability Plan") for violating the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* On July 19, 2011, the Court granted the Defendants summary judgment on Stewart's breach of fiduciary duty claim, and denied the parties' cross motions for summary judgment on his denial of benefits claim, which proceeded to a bench trial on February 27, 2012. ECF Nos. 37, 54. On March 30, 2012, the parties submitted proposed findings of fact and conclusions of law. ECF Nos. 55, 57. For the following reasons, the Court will find that the Defendants abused their discretion under ERISA, and order them to provide Stewart Football Degenerative

T&P benefits.

I. Findings of Fact

As required by Fed. R. Civ. P. 52(a), the Court makes the following findings of fact:

1.  The Plan provides retirement, disability, and related benefits to eligible National Football League ("NFL") players and their beneficiaries.  Admin. Rec. 387.

2.  Under Article 5 of the Plan, a covered player who becomes "totally and permanently" disabled is eligible to receive "a monthly total and permanent disability ("T&P") benefit." Admin. Rec. 404.

3.  A player is totally and permanently disabled if "he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit." Admin. Rec. 406.

4.  The Plan offers four types of T&P benefits:

    (a)     Active Football.  The monthly [T&P] benefit will be no less than $4,000 if the disability(ies) results from [NFL] football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled 'shortly after' the disability(ies) first arises.

    (b)     Active Non-football.  The monthly [T&P] benefit will be no less than $4,000 if the disability(ies) does not result from [NFL] football activities, but does arise while the Player is an Active Player and does cause the Player to be totally and permanently disabled 'shortly after' the disability(ies) first arises.

(c)     Football Degenerative.  The monthly [T&P] benefit will be no less than $4,000 if the disability(ies) arises out of [NFL] football activities, and results in total and permanent disability before fifteen years after the end of the Player's last Credited Season.

(d)     Inactive.  This category applies if (1) the total and permanent disability arises from other than [NFL] football activities while the Player is a Vested Inactive Player, or (2) the disability(ies) arises out of [NFL] football activities and results in total and permanent disability fifteen or more years after the end of the Player's last Credited Season.

Admin. Rec. 404-05.

5.   Under the Plan, a disability "arises out of [NFL] football activities" when it "arises out of any [NFL] pre-season, regular season, or post season game, or any combination thereof, or out of [NFL] football activities supervised by an Employer, including all required or directed activities."  Admin. Rec. 413.

6.   "'Arising out of [NFL] football activities' does not include . . . any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than [NFL] football activities."  Admin. Rec. 413.

7.   T&P benefits claims are first reviewed by the Plan's Disability Initial Claims Committee ("the Committee").

Admin. Rec. 418-19.

8.  The Committee's decision may be appealed to the Board.

    Admin. Rec. 417.

9.  The Board has six voting members: three who are appointed

    by the NFL Players Association, and three appointed by the

    NFL Management Council.  Admin. Rec. 416.

10. The Plan gives the Board "full and absolute discretion,

    authority and power to interpret, control, implement, and

    manage the Plan."  Admin. Rec. 416.

11. The plan provides that the Board and Committee

    > will discharge their duties . . . solely and
    > exclusively in the interest of the Players and their
    > beneficiaries, and with care, skill, and diligence
    > under the circumstances then prevailing that a prudent
    > man acting in a like capacity and familiar with such
    > matters would use in the conduct of an enterprise of
    > like character and with like aims.

    Admin. Rec. 419.

12. Stewart is a former NFL player.  Admin. Rec. 281.

13. In 1989, Stewart was drafted by the Cleveland Browns.

    Admin. Rec. 283.

14. In 1990, he stepped in a hole during summer training camp

    and "felt a 'pop' in his right Achilles[] tendon."  Admin.

    Rec. 283.

15. His right Achilles tendon was partially torn, and Stewart

    was immobilized and required to wear "a boot."  Admin. Rec.

    283.

16.  In 1991, Stewart joined the Cincinnati Bengals. Admin.
     Rec. 283.

17.  During a Bengals practice, he "took a chop block to his
     left knee and was taken off the field." Admin. Rec. 283.

18.  He was diagnosed with a torn left anterior cruciate
     ligament ("ACL")[1] and a torn lateral meniscus.[2] Admin. Rec.
     283.

19.  On August 14, 1991, Dr. Height, the Bengals' team
     physician, performed surgery on Stewart's left knee.
     Admin. Rec. 283.

20.  After the surgery, Stewart had "extensive rehabilitation,"
     and missed the remainder of the 1991 and 1992 seasons.
     Admin. Rec. 283.

21.  When his contract with the Bengals ended, Stewart was
     signed by the San Francisco 49ers. Admin. Rec. 283.

22.  In 1993, Stewart injured his right hand during a 49ers pre-
     season game in Barcelona, Spain. Admin. Rec. 283.

---

[1] The ACL "is in the middle of the knee" and "prevents the shin
bone from sliding out in front of the thigh bone." *See*
MedlinePlus, "Anterior cruciate ligament (ACL) injury,"
www.nlm.nih.gov/medlineplus/ency/article/001074.htm (last
visited June 8, 2012).

[2] The meniscus is "a C-shaped piece of cartilage located in the
knee" that "serves as a shock-absorption system, assists in
lubricating the knee joint, and limits the ability to flex and
extend the joint." *See* MedlinePlus, "Meniscus tears,"
www.nlm.nih.gov/medlineplus/ency/article/001071.htm (last
visited June 8, 2012).

23. His hand was x-rayed in Barcelona and injected with a local anesthetic. Admin. Rec. 283-84.

24. About 10 days later, Stewart returned to San Francisco, and was seen by Dr. Gordon Brody. Admin. Rec. 284.

25. His right hand was "very swollen," and Dr. Brody diagnosed Stewart with "a 10 day old complex closed intra-articular fracture." Admin. Rec. 284.

26. On August 19, 1993, Dr. Brody performed a two-hour surgery to repair the fracture, which was complicated by the delay between the injury and treatment. Admin. Rec. 284.

27. Stewart missed the 1993 season, and joined the Canadian Football League ("CFL") in 1994. Admin. Rec. 284.

28. Stewart played throughout the 1994 and 1995 seasons. Admin. Rec. 284.

29. In December 1996, Stewart had surgery on his right knee and "was recorded to have osteoarthritis[3] in th[at] knee." Admin. Rec. 284.

30. In 1997, while playing for the Toronto Argonauts, Stewart injured his right elbow. Admin. Rec. 284.

31. He was diagnosed with a "partial tear or hematoma in the

---

[3] Osteoarthritis, "the most common form of arthritis," "breaks down the cartilage in your joints." MedlinePlus, "Osteo-arthritis," www.nlm.nih.gov/medlineplus/osteoarthritis.html (last visited June 8, 2012).

right triceps[4] with a large olecranon bursitis."[5]  *Id.*   The

bursitis was excised.  Admin. Rec. 284.

32.  In September 1998, Stewart had a second surgery on his left

knee.  Admin. Rec. 284.

33.  After the surgery, the doctor noted that "the knee was

stable," "the patellofemoral joint[6] was normal," "the medial

compartment[7] was examined and looked 'fine,' the lateral

compartment[8] had a degenerative type tear of the lateral

meniscus which was debrided,[9] and the articular surfaces of

---

[4] The triceps is the "large muscle at the back of the upper arm
that extends the forearm when contracted."  Webster's New World
Dictionary 1427 (3d College Ed. 1988).

[5] Bursitis is inflammation of a bursa, "a filmy-colored sac that
protects and cushions [the] joints."  MedlinePlus, "Bursitis,"
www.nlm.nih.gov/medlineplus/bursitis.html (last visited June 8,
2012).

[6] The patellofemoral joint is the knee cap.  *See* MedlinePlus,
"Chondromalacia patella,"
www.nlm.nih.gov/medlineplus/ency/article/000452.htm (last
visited June 8, 2012).

[7] "Medial" refers to the inner compartment.  *See* Mayo Clinic,
"Knee braces for osteoarthritis,"
www.mayoclinic.com/health/knee-braces/MY00137 (last visited June
8, 2012).

[8] "Lateral" refers to the outer compartment.  *See* "Knee braces
for osteoarthritis," *supra* note 7.

[9] Debridement is the surgical "cutting away of dead or
contaminated tissue or foreign material from a wound to prevent
infection."  Webster's New World Dictionary 356 (3d College Ed.
1988).

the femur[10] and tibia[11] were still 'reasonably good.'"
Admin. Rec. 284.

34. Stewart retired from football, but rejoined the Argonauts
in 2000.  Admin. Rec. 284.

35. That year, Stewart tore his distal right quadriceps tendon[12]
at training camp; the injury ended his career.  Admin. Rec.
284.

36. Stewart remained in Canada and tried to obtain a job in
criminal justice, but was unable to pass the required
physical exams.  Admin. Rec. 284.

37. Stewart found work at a friend's landscape design business,
but resigned in 2003 because he was unable to use certain
tools, or walk or stand for long periods.  Admin. Rec. 284.

38. As of 2009, Stewart remained unemployed.  Admin. Rec. 284.

39. On October 27, 2008, Stewart applied to the Plan for T&P
benefits.  Admin. Rec. 267.

40. In his application, Stewart stated that since 2002 he had
been unable to work because of "constant pain due to

---

[10] The femur is the bone that extends from the hip to the knee.
*See* Webster's New World Dictionary 498 (3d College Ed. 1988).

[11] The tibia, also called the shinbone, is the thicker of two
bones between the knee and the ankle.  *See* Webster's New World
Dictionary 1397 (3d College Ed. 1988).

[12] The distal right quadriceps is the large, outer muscle at the
front of the thigh, which extends the leg. *See* Webster's New
World Dictionary 398, 1098 (3d College Ed. 1988).

injuries."   Admin. Rec. 268.

41.   On November 5, 2008, the Plan informed Stewart that he was
      "required to be evaluated by a neutral physician."   Admin.
      Rec. 275.

42.   Because Stewart refused to leave Canada, the Plan arranged
      for Dr. Robert Meek, a Canadian orthopedic doctor, to
      examine him.   Admin. Rec. 277, 491.

43.   Dr. Meek examined Stewart on January 14, 2009.   Admin. Rec.
      283.

44.   Dr. Meek noted that Stewart's left knee was in "constant
      pain," he could not squat, he had "difficulty getting out
      of a chair," and "[s]tairs [were] hard to negotiate."
      Admin. Rec. 284.

45.   Dr. Meek determined that Stewart's left knee "flexe[d] to
      about 100 degrees," but it "seem[ed] quite painful" to flex
      further.   Admin. Rec. 285.

46.   He noted that Stewart had "patellofemoral crepitus[13] and
      palpable osteophytes[14] on the upper tibia."   Admin. Rec.
      285.

---

[13] Patellofemoral crepitus is a "grating or crackling sound or
sensation" of the knee and femur, "as that produced by the
fractured ends of a bone moving against each other."   *See*
Merriam-Webster Medical Dictionary, www.merriam-
webster.com/medical/patellofemoral, www.merriam-
webster.com/medical/crepitation (last visited June 8, 2012).

[14] Osteophytes are "small bony outgrowth[s]."   Webster's New
World Dictionary 958 (3d College Ed. 1988).

47.  Stewart had some tenderness, scarring, and numbness
     "related to the staple from his ACL reconstruction."
     Admin. Rec. 285.

48.  An x-ray showed "a staple and a screw in the femur and the
     tibia . . . from the ACL repair of the left knee." Admin.
     Rec. 286.

49.  After examining Stewart's right arm, Dr. Meek opined that
     it was "weak at the elbow particularly in extension."
     Admin. Rec. 285.

50.  Stewart could not "do anything vigorous or precise with his
     right hand because of pain, weakness and inability to fully
     . . . flex his right index finger." Admin. Rec. 285.

51.  Stewart had a "palpable defect in the triceps . . . and a
     bulge in the proximal triceps." Admin. Rec. 285.

52.  He had "mild osteoarthritis with a loose body of small
     fragment" at the right elbow, and his "right 2nd
     metacarpophalangeal joint (MCP)[15] ha[d] a scar over it."
     Admin. Rec. 285-86.

53.  Stewart could "only flex at the MCP to about 85 degrees,"
     and had "particular weakness of the flexor digitorum

---

[15] The MCP is the "large joint[] in the hand at the base of each
finger," which acts as a "complex hinge joint[]" that is
"important for both power grip and pinch activities." *See*
American Society for Surgery of the Hand, *Arthritis: MP Joint*,
www.assh.org/PUBLIC/HANDCONDITIONS/Pages/ArthritisMPJoint.aspx
(last visited June 11, 2012).

profundus."[16]  Admin. Rec. 285.

54.  An x-ray of Stewart's right hand showed "a healed fracture
     of the distal 2nd [MCP] with 2 small screws in place."
     Admin. Rec. 286.

55.  Dr. Meek opined that "over a football career in the NFL and
     the CFL," Stewart had suffered "injuries which . . .  left
     him with pain and disability in three of his four
     extremities."[17]

56.  Stewart's surgeries had "mitigate[d] or cure[d] these
     injuries with only partial success."  Admin. Rec. 286.

57.  Dr. Meek concluded that Stewart was "genuinely disabled";
     although Stewart might have "benefit[ted] to some degree
     from removal of the metal from his right hand and from his
     left knee area," and might have been "more comfortable . .
     . [were] he [to] ha[ve] a successful total [left] knee
     replacement," Dr. Meek determined that these surgeries
     would not make Stewart employable.  Admin. Rec. 286.

---

[16] The flexor digitorum profundus is a deep muscle in the side of
the forearm that flexes the bones of the four fingers. *See*
Merriam-Webster's Medical Dictionary, www.merriam-
webster.com/medical/flexor%20digitorum%20profundus (last visited
June 11, 2012).

[17] Admin. Rec. 286.  Dr. Meek had also noted that Stewart had
"weakness of the right calf" and was unable to "do a toe raise
on that side."  Admin. Rec. 285.  He had "a moderately stiff
neck with about half the normal expected motion but . . .  no
neck pain or tenderness."  *Id.*  "His shoulders both move[d] well
and ha[d] no weakness."  *Id.*  "His left upper extremity [was]
normal."  *Id.*

58.  On February 3, 2009, the Committee approved Stewart's T&P

     benefits claim, but awarded him only "Inactive" T&P

     benefits because it "found that [Stewart's] disabling

     condition(s) did not arise out of [NFL] football

     activities."[18]

59.  The Committee provided no explanation of how or why it had

     reached that conclusion.  *See* Admin. Rec. 291-93.

60.  On July 15, 2009, Stewart appealed the Committee's determi-

     nation to the Board, requesting Football Degenerative T&P

     benefits.  *See* Admin. Rec. 312-314.

61.  In his appeal, Stewart argued that his left knee and right

     hand were disabled as "the direct result of his employment

     with NFL teams," and "there [was] no factual basis for a

     determination that th[ose] injuries would not be disabling

     but for the [other] CFL injuries."  Admin. Rec. 313.

62.  Stewart requested that the Board contact Dr. Meek if it

     needed clarification of his report, and stated that

     "implicit in [the] report is [Dr. Meek's] opinion that the

     NFL related disabilities . . . *by themselves* . . .

     prevent[ed] [Stewart's] gainful employment."  Admin. Rec.

     313-314 (emphasis in original).

63.  Without contacting Dr. Meek, the Board affirmed the

---

[18] Admin. Rec. 291-93.  The effective date of the benefits was
August 1, 2008.  Admin. Rec. 291.

Committee's decision on August 18, 2009.  *See* Admin. Rec.
317-19.

64. On October 6, 2009, Stewart sued the Defendants for denial
    of ERISA benefits, and breach of fiduciary duty.  ECF No.
    1.

65. On April 5, 2010, the parties filed a joint stipulation
    agreeing to remand Stewart's claim for reconsideration by
    the Board.  ECF No. 12.

66. This Court approved the stipulation on April 8, 2010, and
    ordered the parties to submit a status report within 30
    days after the Board issued its remand decision.  ECF No.
    13.

67. On April 15, 2010, Paul Scott, a Plan benefits coordinator,
    asked Dr. Meek to submit a letter clarifying "whether Mr.
    Stewart would be totally and permanently [disabled] if he
    had not played in the CFL."  Admin. Rec. 475.

68. On April 19, 2010, Scott asked Dr. Bernard R. Bach, an
    orthopedic surgeon who sometimes acted as a "Medical
    Advisory Physician" for the Board,[19] to review Stewart's

---

[19] Under the Plan, Medical Advisory Physicians made determina-
tions on "medical issues submitted by the Retirement Board," and
based on their "review [of] all material submitted to the Plan"
and additional consultations they deemed necessary.  Admin. Rec.
423-24.  Under Section 8.3 of the Plan, the Board, if dead-
locked, could "submit [its] dispute[] to a Medical Advisory
Physician for a final and binding determination regarding such
medical issues."  Admin. Rec. 418.  Bach was not acting as a

medical records and give his opinion about the claim. Admin. Rec. 480.

69. Dr. Bach submitted his opinion on April 24, 2010.  Admin. Rec. 476-78.

70. He stated that he had been "simply asked to review [Stewart's medical records] with regards to whether [his] NFL-related injuries would be consistent with the criteria for total and permanent disability."  Admin. Rec. 477.

71. Although he did not "personally review[] any radiographs" or "examin[e] the patient," Bach determined that the injuries Stewart sustained in the NFL "would not qualify him for total and permanent disability."  Admin. Rec. 477-78.

72. Dr. Bach explained that the NFL-related injuries were to Stewart's "left knee with an ACL injury and partial meniscectomy, a right ankle partial Achilles tendon rupture, and a right hand second metacarpal[20] fracture." Admin. Rec. 476.

---

Medical Advisory Physician in the capacity described in Section 8.3 when he was consulted about Stewart's condition.  *See* Admin. Rec. 489-90 (letter from Plan Director Sarah E. Gaunt to Michael Rosenthal, noting that the Board had forwarded Stewart's records to Dr. Bach "for his examination and comment," not a "final and binding" decision); *see also* Court's Findings 70 & 76.

[20] The metacarpus is the part of the hand between the wrist and the finger bones.  *See* Merriam-Webster's Medical Dictionary, www.merriam-webster.com/medical/metacarpus, www.merriam-webster.com/medical/carpus (last visited June 11, 2012).

73.  He stated that after Stewart's second left knee surgery in
     1998, a "very brief operative report" stated that "the knee
     was stable, that the patellofemoral joint was normal, that
     the medial compartment was examined and looked 'fine,' the
     lateral compartment had a degenerative type tear of the
     lateral meniscus which was debrided, and the articular
     surfaces of the femur and tibia were still 'reasonably
     good.'"  Admin. Rec. 477.

74.  He noted that the records indicated that the right Achilles
     tendon injury was "not a complete injury" and had been
     "treated nonsurgically," and Stewart had "underwent open
     treatment of a complex closed articular fracture of the
     metacarpal head and neck"[21] at Stanford University in 1993.
     Admin. Rec. 477.

75.  Relying on his "experience as a Board Certified . . .
     Orthopaedic Surgeon with a specialty in Sports Medicine,"
     Dr. Bach determined that Stewart's NFL injuries had not
     left him totally and permanently disabled.  Admin. Rec.
     478.

---

[21] Each metacarpal bone "consists of the base, the shaft, the
neck, and the head."  Manuel Hernandez & Jacob W. Ufberg,
"Boxer's Fracture," eMedicineHealth, www.emedicinehealth.com/
boxers_fracture/article_em.htm (last visited June 11, 2012).
"The shaft is the long, slender portion of the bone."  *Id.*  "The
neck is the portion of the bone that connects the shaft to the
head."  *Id.*  "The head of the metacarpal bone connects the
metacarpal bone to the bone of the finger."  *Id.*

76. Dr. Bach also stated that he was a "Medical Advisory Physician[] for the [Plan]," but that any opinions rendered as to whether a player qualified for benefits were given "independent of . . . whether [the opinions would] qualify a player for [particular] disability benefits." Admin. Rec. 478.

77. On April 29, 2010, Dr. Meek submitted a letter clarifying his opinion:

> Mr. Stewart clearly developed significant injuries while playing in both the CFL and the NFL. His left knee seems to be one of the major sources of disability and it certainly has major post-traumatic arthritis. This is the knee he injured when practicing for the Bengals . . . As well, he still has some disability related to the right hand finger injury, which [occurred] when he was with the 49ers. You will recall that this injury was missed at a pre-season game in Barcelona, Spain[,] and not diagnosed and treated for 10 days. It is true that he suffered a significant elbow injury and right knee injury when playing in the CFL as well . . . It is always hard to decide which of a series of injuries are the 'disabling' one[s]. On balance, I think his left knee and right hand injuries would have left him disabled, even if he hadn't played in the CFL.

Admin. Rec. 479.

78. In May 2010, Scott requested that Dr. Bach and Dr. Meek review each other's opinions and provide their "complete and final opinion[s] on the matter." Admin. Rec. 481-82.

79. On May 27, 2010, Dr. Bach responded with a one-paragraph letter. Admin. Rec. 483.

16

80.  The first sentence was unclear:

> I am in receipt of your theory which in my
> opinion regarding April 24, 2010 letter and
> report as well as the response from Dr. Robert N.
> Meek, M.D., an orthopedic trauma surgeon from
> Vancouver, British Columbia.

Admin. Rec. 483.

81.  Dr. Bach's letter continued:

> As you know, the issue in this situation is not
> whether Mr. Andrew Stewart meets the criteria for
> line of duty disability; it is whether he is totally
> and permanently disabled.  My understanding of this
> definition . . . is whether an individual is . . .
> unable to perform any line of work.  Based on this,
> in my opinion, Mr. Andrew Stewart is not totally and
> permanently disabled.

Admin. Rec. 483.

82.  On June 7, 2010, Dr. Meek responded:

> I appreciate the difficulty you have in determining
> the permanent disability status of a player who was
> injured in two different settings, the NFL and CFL.
> I also appreciate the difficulty Dr. Bach faces in
> making this determination with only records to
> review and without the chance to see and examine the
> patient and his [x-rays].  I feel that talking to
> and examining the patient and personally reviewing
> the [x-rays] adds significantly to my ability to
> assess patients.

> Mr. Stewart clearly developed significant injuries
> while playing in both the CFL and the NFL.  His left
> knee (the one injured and treated when he was with
> the Bengals) seemed to be one of the major sources
> of disability and it certainly had major post-
> traumatic arthritis.  The subsequent surgery he had
> on his left knee when he was in the CFL was, in my
> view, clearly related to his original left knee
> injury sustained in Cincinnati.  As well, he had
> some disability related to the right hand finger
> injury, which was repaired at Stanford when he was

17

> with the 49ers.  My final opinion has not changed .
> . . It is always hard to decide which of a series of
> injuries are the 'disabling' ones.  On balance, I
> think his left knee and right hand injuries would
> have left him disabled, even if he hadn't played in
> the CFL.

Admin. Rec. 484 (internal quotation marks omitted).

83.   Dr. Meek also stated that Dr. Bach's April 24, 2010 report

had "correctly . . . reported his potential conflict of

interest [because] he is one of the Medical Advisory

Physicians for the [Plan]."  Admin. Rec. 484.

84.   Dr. Meek said that he "ha[d] no likely conflicts of

interest and ha[d] not been associated with the NFL or the

NFL Players Association."  Admin. Rec. 484.

85.   On August 2, 2010, Scott sought further clarification from

Dr. Bach:

> This is an unusual case and the Retirement Board
> needs your expertise.  Please help us by reviewing
> the   following   and   providing   comment   and
> clarification as appropriate:
>
> 1.   We have been unable to obtain copies of Mr.
> Stewart's x-rays discussed in Dr. Meek's report.
> Please address whether your assessment of Mr.
> Stewart's case would be better substantiated if you
> could review those x-rays.
>
> 2.   In your correspondence you state that "the issue
> in this situation is not whether Mr. Andrew Stewart
> meets the criteria for line of duty disability; it
> is whether he is totally and permanently disabled."
> That is incorrect.  We asked you to assume that Mr.
> Stewart is totally and permanently disabled.  The
> question is, given that assumption, whether Mr.
> Stewart is totally and permanently disabled due to
> NFL football activities.

3.   We need you to address in detail this issue of whether Mr. Stewart would be totally and permanently disabled based on his NFL football activities only. In your letter of 4/24/2010 you state that Mr. Stewart's NFL-related injuries were

- to his left knee with an ACL injury and partial lateral meniscectomy[,]

- a right ankle partial Achilles tendon rupture, and

- a right hand second metacarpal fracture requiring surgery.

Please explain . . . (i) how you believe each of these impairments would likely have evolved had Mr. Stewart NOT played in the CFL (ii) the likely cumulative effect of these NFL-only injuries today, and (iii) whether these NFL injuries by themselves would likely have rendered him totally and permanently disabled.

Admin. Rec. 485.

86.   On August 4, 2010, Dr. Bach wrote to Scott that Stewart was "not totally and permanently disabled due to NFL football activities," and review of the x-rays would "not affect [his] opinions." Admin. Rec. 486.

87.   Dr. Bach stated that neither "[t]he left knee ACL and partial lateral meniscectomy," nor the "right ankle partial Achilles tendon rupture," would qualify Stewart "for total and permanent disability." Admin. Rec. 486.

88.   Dr. Bach concluded that the right hand metacarpal fracture did not disable Stewart, and "[c]umulatively, these three issues would not qualify him for total and permanent

19

disability." Admin. Rec. 486.

89. Dr. Bach also stated:

> Clearly Dr. Meek does not understand the collective
> bargaining process and collective bargaining
> agreements. Also of interest is the final paragraph
> [of his opinion] that indicated that I had a
> potential conflict of interest . . . In fact, I have
> no specific conflict of interest because I am paid
> independent of the opinions that I render and this
> is specifically explained to each and every patient
> that I see as a [M]edical [A]dvisory [P]hysician.

Admin. Rec. 486.

90. On August 18, 2010, the Board reconsidered Stewart's claim,

and affirmed its decision that he was ineligible for

Football Degenerative T&P benefits. Admin. Rec. 488.

91. At the meeting, the Board noted that the opinions of Dr.

Meek and Dr. Bach conflicted. Admin. Rec. 489.

92. The Plan's Medical Director,[22] Dr. Stephen Haas, was at the

meeting, and the Board "asked for his views on the matter."

Admin. Rec. 490.

93. Dr. Haas "reviewed the conflicting letters and medical

reports," and stated that "the matter is 'not even close'";

---

[22] The Plan provides for appointment of a Medical Director who
will give "medical advice with respect to the Plan's neutral
physicians and medical examination procedures." Admin. Rec.
430. The Medical Director "will provide advice on medical
issues relating to particular disability benefit claim as
requested by a member of the [Board] or a member of the
[Committee]." *Id.* "The Medical Director will not examine
Players, and will not decide or recommend whether a particular
Player qualifies for a disability benefit." *Id.*

"Stewart's injuries suffered during his NFL career did not

produce total and permanent disability."  Admin. Rec. 490.

94.  In deciding that Stewart was not entitled to Football

Degenerative benefits, the Board "took the following facts

into account":

> Dr. Bach is one of the most respected physicians in
> the Plan's network . . . Where appropriate the Board
> asks him to act as a Medical Advisory Physician . .
> . The Board trusts Dr. Bach's judgment completely;
> when Dr. Bach acts as a MAP his decisions are 'final
> and binding' upon the . . . Board[.]

> Dr. Bach's credentials are impeccable.  His 95-page
> resume  is  available  online.   He  held  a  sports
> medicine  fellowship  at  the  Hospital  for  Special
> Surgery in New York; he holds an endowed chair in
> orthopedic  surgery  at  Rush  Medical  College  in
> Chicago; he has published prolifically and taught
> continuing education classes frequently.  He has won
> awards  from  the  American  Orthopedic  Society  for
> Sports Medicine.  He maintains an active practice in
> orthopedic surgery and sports medicine.

> In contrast, Dr. Meek has no history or relationship
> with the Plan other than in this case . . . Dr. Meek
> has  examined  no  player  other  than  Mr.  Stewart  on
> behalf of the Plan.

Admin. Rec. 490-91.

95.  The Board also discredited Dr. Meek because "the tone" of

his June 7, 2010 letter was "unprofessional" and "cast

doubt on the impartiality and reliability of his

conclusion"; the Board found that Dr. Meek's statements

about Dr. Bach's conflict of interest were "not only wrong

but appear[ed] to be intentionally misleading" because "Dr.

Bach has absolutely no conflict of interest," "is paid the same regardless of his conclusions," and "[t]ime and time again has concluded that a player is entitled to the benefits he needs." Admin. Rec. 491.

96. The Board noted that, "although Dr. Bach did not personally examine Mr. Stewart, the issue [was] not [Stewart's] current condition . . . but rather causation," and "a review of the medical records was sufficient and appropriate." Admin. Rec. 491.

97. The Board characterized Dr. Meek's opinion as based "in large part" on "Mr. Stewart's condition today," which it "found . . . difficult to believe [would produce] a reliable opinion" on the issue of causation. Admin. Rec. 491.

98. The Board "relied on the unequivocal views of Dr. Haas" whose credentials were "even more impressive than Dr. Bach's":

> He has served as an orthopedic consultant to the Social Security Administration, Department of Commerce, Department of Labor, and the White House. . . . [H]e has treated Presidents of the United States.    He has decades of experience with orthopedic injuries of professional athletes . . . , and he has served as the team physician for several professional sports teams."

Admin. Rec. 491-92.

99. The Board noted that it also relied on "its own extensive

experience in reviewing claims for disability benefits."
Admin. Rec. 492.

100. The Board concluded that it "could not ignore that Mr.
     Stewart played in the CFL for at least four years after his
     NFL career ended," which "strongly suggest[ed] that his NFL
     injuries could not, by themselves, have caused total and
     permanent disability." Admin. Rec. 492.

101. The Board also found that Stewart's "NFL injuries must have
     been generally amendable to recovery and rehabilitation,
     and that a person with major, long-term impairments could
     not possibly have participated in the incredibly demanding
     sport of professional football for four or more years after
     leaving the NFL." Admin. Rec. 492.

102. On September 21, 2010, Stewart submitted a status report
     informing the Court that the Plan had issued its final
     denial of his claim, and he wished to proceed with
     discovery. ECF No. 14.

II. Conclusions of Law

     Stewart argued that the Defendants abused their discretion
in denying him Football Degenerative T&P benefits because the
Board arbitrarily discredited Dr. Meek's opinion, accepted Dr.
Bach's "unreasoned and unexplained" report, and impermissibly
relied on Dr. Haas's recommendation. ECF No. 56 at 4-16; ECF
No. 57 at 15-16. The Defendants countered that the Board's

23

denial was reasonable because there was substantial evidence that Stewart's career in the CFL caused his disabilities, and the Board reasonably relied on the expertise of Drs. Bach and Haas.  ECF No. 55 at 15-21.

A. Standard of Review

When, as here, an ERISA benefit plan vests the plan administrator with discretionary authority to make eligibility determinations, the court reviews the administrator's decision for abuse of discretion. *Williams v. Metro. Life Ins., Co.,* 609 F.3d 622, 629-30 (4th Cir. 2010).  The plaintiff has the burden of proving an abuse of discretion.[23]

Under the abuse of discretion standard, the Court "must not disturb the [administrator's] decision if it is reasonable, even if the court itself would have reached a different conclusion." *Fortier v. Principal Life Ins. Co.*, 666 F.3d 231, 235 (4th Cir. 2012).  "The administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and it is supported by substantial evidence[.]"  *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011) (internal quotation marks omitted).  Substantial evidence is that "which a reasoning

---

[23] *Saah v. Contel Corp.*, 780 F. Supp. 311, 315 (D. Md. 1991), *aff'd* 978 F.2d 1256 (table), 1991 WL 310225 (4th Cir. 1992). *Accord Atwater v. Nortel Networks, Inc.*, 388 F. Supp. 2d 610, 617 (M.D.N.C. 2005); *Case v. Continental Cas. Co.*, 289 F. Supp. 2d 732, 737 (E.D. Va. 2003).

mind would accept as sufficient to support a particular conclusion." *Id.* It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."[24] "[I]f there is evidence to justify a refusal to direct a verdict were the case before the jury, then there is substantial evidence."[25]

The Fourth Circuit has identified eight nonexclusive factors that the Court may consider in reviewing the reasonableness of an administrator's decision:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*DuPerry*, 632 F.3d at 869 (internal citation and quotation marks omitted).

In making its determination, the Court may consider only the evidence that was before the plan administrator at the time

---

[24] *LeFebre v. Westinghouse Elec. Corp.,* 747 F.2d 197, 208 (4th Cir. 1984), *overruled by implication on other grounds by Black & Decker Disability Plan v. Nord,* 538 U.S. 822 (2003).

[25] *Bickel v. Sunbelt Rentals, Inc.,* Case No. WMN-09-2735, 2010 WL 3938348, at *3 (D. Md. Oct. 6, 2010) (internal quotation marks omitted) (*quoting Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

it made its decision.[26]  To be reasonable, the administrator's decision "must be based on the whole record[,] and the [administrator] cannot pick and choose evidence that supports its decision while ignoring other relevant evidence in the record."[27]

B. Stewart's Complaint

The parties agreed that Stewart is totally and permanently disabled; they disputed the cause of his disability and the benefits for which he qualifies.

Stewart asserted that he was entitled to Football Degenerative T&P benefits because his disability arose out of his injuries in the NFL.  *See* Compl. ¶ 39.  He argued that the Board's decision to deny him those benefits "was not the result of a deliberate, principled reasoning process supported by substantial evidence, but rather was the product of a sham process in which the opinions of Drs. Haas and Bach served as mere backfill for a predetermined outcome."  ECF No. 56 at 2 (internal quotation marks omitted).

---

[26] *See, e.g.*, *Stup v. UNUM Life Ins. Co. of Am.*, 390 F.3d 301, 307 n.3 (4th Cir. 2004), *abrogated on other grounds, Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).  *See also Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 631 (4th Cir. 2010) (a court may consider only "the existing administrative record," not "any testimony or other additional evidence obtained outside the administrative record").

[27] *Mills v. Union Sec. Ins. Co.*, ---F. Supp. 2d---, 211 WL 2036698, at *11 (E.D.N.C. May 24, 2011) (*citing Myers v. Hercules, Inc.*, 253 F.3d 761, 768 (4th Cir. 2001)).

The Defendants countered that Stewart qualified only for Inactive T&P benefits because "Stewart's lengthy CFL career was a cause of his disabilities." ECF No. 55 at 16. They argued that the Board's decision "was based on substantial evidence, was the product of thorough investigation and consideration, comports with common sense, and was a reasonable resolution in light of the dual-career circumstances here." ECF No. 55 at 2.

The Court applies the eight *DuPerry* factors to determine the reasonableness of the Board's decision.

1. Purposes and Language of the Plan (Factors 1 and 2)

A primary purpose of the Plan is to provide disability benefits to qualifying NFL players and their beneficiaries. *See* Admin. Rec. 387. An ERISA plan administrator is "obligated to guard the assets of the [Plan] from improper claims, as well as to pay legitimate claims." *Brogan v. Holland*, 105 F.3d 158, 164 (4th Cir. 1997) (internal quotation marks and ellipsis omitted).

Although the Plan does not explicitly define "degenerative injury," it provides Football Degenerative T&P benefits for injuries that "result[] in total and permanent disability before fifteen years after the end of the Player's last Credited Season." *See* Admin. Rec. 404-05. In evaluating Stewart's claim for Football Degenerative T&P benefits, the Board was required to determine whether Stewart's disabilities "ar[ose] out of [NFL] football activities"--such as pre-season practices or

27

regular season games--and "result[ed] in total and permanent
disability." *See* Admin. Rec. 404, 413.  Stewart's disability
did not "aris[e] out of [NFL] football activities" if it
"result[ed] from other employment" or "would not [have]
qualif[ied] [him] for benefits but for an injury . . . that
ar[ose] out of other than [NFL] football activities."  Admin.
Rec. 413.  Thus, in determining whether Stewart qualified for
Football Degenerative T&P benefits, the Board had to determine
whether his disability stemmed from NFL injuries that would have
left him totally and permanently disabled had he not played in
the CFL.  *See* Admin. Rec. 404, 413.

The Board was required to make its decision "with [the]
care, skill, and diligence . . . that a prudent man acting in a
like capacity and familiar with such matters" would use.  *See*
Admin. Rec. 419.  The Board was permitted to seek "advice on
medical issues" from its Medical Director, Dr. Haas.  *See* Admin.
Rec. 430.  But the Plan did not permit Dr. Haas to "decide or
recommend whether [Stewart] qualifie[d] for" Football
Degenerative T&P benefits.  *See id.*

Stewart argued that the Board violated the Plan's language
by soliciting "a benefits eligibility determination from [Dr.
Haas] to 'break the tie'" between Drs. Meek and Bach.  ECF No.
56 at 1.  He pointed to the Board's admission that it had "asked
for [Dr. Haas's] views on the matter" and "relied on [his]

unequivocal views" in denying Stewart Football Degenerative T&P
benefits. *Id.* at 5.

The Defendants countered that Dr. Haas merely advised the
Board "on a medical issue, opining that Stewart's injuries
suffered during his NFL career did not produce total and
permanent disability." ECF No. 55 at 21.

The administrative record does not establish that Dr. Haas
improperly "decide[d] or recommend[ed] whether [Stewart]
qualifie[d]" for Football Degenerative T&P benefits. At its
August 18, 2010 meeting, the Board noted that the opinions of
Drs. Meek and Bach conflicted, and "asked for [Dr. Haas's] views
on the matter." *See* Admin. Rec. 489-90. Dr. Haas stated that,
in his professional opinion, it was "not even close": "Stewart's
injuries . . . during his NFL career did not produce total and
permanent disability." Admin. Rec. 490.

Whether Stewart's disability stemmed from his NFL injuries
determined whether he qualified for Football Degenerative T&P
benefits. *See* Admin. Rec. 404, 413. But Dr. Haas did not
impermissibly "decide or recommend" which benefits Stewart would
receive merely because he opined that Stewart's NFL injuries did
not leave him totally and permanently disabled. In making its
determination, the Board also considered the opinions of Drs.
Meek and Bach, their backgrounds, and Stewart's career. Admin.
Rec. 490-92.

Although Stewart argued that Dr. Haas's "cursory statement" was not "advice on medical issues," *see* ECF No. 56 at 5, the Court is not persuaded.  The Plan does not define "advice" or specify the detail required of the Medical Director's answers to Board members' questions.[28]  Thus, the Court does not agree with Stewart that the Board "plainly violated the Plan by relying on and adopting Dr. Haas's recommendation to deny Stewart's claim for Football Degenerative benefits."  ECF No. 56 at 7.

It is less clear whether the Board's ultimate decision comports with the Plan's implied definition of "degenerative injury," or whether the Board acted "with [the] care, skill, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters" would use.  *See* Admin. Rec. 419.  To answer these questions, the Court must consider the other *DuPerry* factors.

2. Adequacy of the Materials and the Use of Reasoned and

Principled Decision-Making (Factors 3 and 5)

Stewart argued that the Board's decision was "not the product of a deliberate, principled reasoning process and was not supported by substantial evidence" because the Board "arbitrarily discredited Dr. Meek" and "relied on flawed and

---

[28] Common definitions of "advice" include an "opinion given as to what to do or how to handle a situation," "counsel," and "information."  *See* Webster's New World Dictionary 20 (3d College Ed. 1988).

unreasoned reports from Dr. Bach." ECF No. 56 at 16-17.

The Defendants argued that the Board "conducted a thorough and principled review" and relied on its "own experience," the unequivocal reports of Drs. Bach and Haas, and "common sense." ECF No. 55 at 15-21.

Dr. Meek presented a well-reasoned opinion that Stewart's "left knee and right hand injuries [in the NFL] would have left him disabled, even if he hadn't played in the CFL." *See* Admin. Rec. 479. Dr. Meek reviewed Stewart's medical records, physically examined him, and noted that his left knee was in "constant pain" and he could not "do anything vigorous or precise with his right hand because of pain, weakness and inability to fully . . . flex his right index finger." Admin. Rec. 283-85. Dr. Meek concluded that, although Stewart might have "benefit[ted] to some degree" from surgeries on his left knee and right hand, these surgeries would not make Stewart employable. Admin. Rec. 286.

When asked to clarify whether Stewart's NFL injuries left him totally and permanently disabled, Dr. Meek noted that the left knee and right hand had been injured in the NFL. *See* Admin. Rec. 479. Although Stewart had suffered "a significant elbow injury and right knee injury" in the CFL, the records showed no CFL injuries to the left knee and right hand. *See id.* "On balance," Dr. Meek concluded, the "left knee and right hand

injuries would have left [Stewart] disabled, even if he hadn't played in the CFL." *Id.*

Despite Dr. Meek's conclusion, the Board acted reasonably in seeking a second opinion. Dr. Meek conceded that "[i]t is always hard to decide which of a series of injuries are the 'disabling' one[s]." *See* Admin. Rec. 479. The Board's failing was in crediting the flawed reports of Dr. Bach over Dr. Meek's opinion.

In his initial report on April 24, 2010, Dr. Bach apparently misunderstood his assignment and addressed whether Stewart was totally and permanently disabled--not whether NFL injuries had caused the disability that Dr. Bach had been asked to presume.[29] Dr. Bach noted that, after a 1998 knee surgery, Stewart's knee was stable, the knee cap was normal, the joint compartments "looked 'fine,'" and "the articular surfaces of the femur and tibia were still 'reasonably good.'" *See* Admin. Rec. 477. He further explained that Stewart had undergone surgery in 1993 for the fracture in his right hand. *See id.* He concluded that the injuries Stewart sustained in the NFL "would not qualify him for total and permanent disability." Admin. Rec. 477-78.

---

[29] *See* Admin. Rec. 477 (Dr. Bach noting that he had been "simply asked to review [Stewart's medical records] with regards to whether [his] NFL-related injuries would be consistent with the criteria for total and permanent disability").

After being asked to review Dr. Meek's report and provide a "complete and final opinion," Dr. Bach remained uncertain about his assignment. He noted in his May 27, 2010 letter that "the issue in this situation is not whether . . . Stewart meets the criteria for line of duty disability; it is whether he is totally and permanently disabled." *See* Admin. Rec. 483. Scott told Dr. Bach "[t]hat [was] incorrect"; he was to assume that Stewart was disabled. Admin. Rec. 485. Scott asked Dr. Bach to determine only whether Stewart was totally and permanently disabled because of his NFL injuries, and how the NFL injuries would have evolved had Stewart not played in the CFL. *Id.*

Dr. Bach did not adequately respond to Scott's inquiry. In his August 4, 2010 letter, Dr. Bach merely provided conclusive assertions that neither Stewart's left knee nor his right hand injuries would have left him totally and permanently disabled. *See* Admin. Rec. 486. He did not explain how he reached his conclusion, nor did he respond to Scott's question about how Stewart's NFL injuries would have evolved had he not played in the CFL. *See id.* Dr. Bach also failed to provide any specific criticism of Dr. Meek's conclusion that the NFL injuries alone had caused Stewart's disabilities. *See id.* Dr. Bach stated that "Dr. Meek does not understand the collective bargaining process and collective bargaining agreements" but said nothing about why Dr. Meek's medical opinion was incorrect. *See id.*

33

The absence of any explanation made Dr. Bach's opinion an insufficient basis for denying Stewart Football Degenerative T&P benefits.[30]

Dr. Haas's opinion was inadequate for the same reasons. Although Dr. Haas had "decades of experience with orthopedic injuries of professional athletes" and had reviewed "the conflicting letters and medical reports," *see* Admin. Rec. 490-92, the administrative record is silent as to why Dr. Haas thought the causation issue was "not even close." Because such detail is lacking, the Court cannot conclude that Dr. Haas's opinion was adequate evidence upon which to base the Board's decision. *See Gorski*, 314 F. App'x at 547.

The Board's past experience and "common sense" were also insufficient bases for the Board's decision. Scott conceded that Stewart's case was "unusual" and the Board needed doctors'

---

[30] *See Gorski v. ITT Long Term Disability Plan for Salaried Employees*, 314 F. App'x 540, 547 (4th Cir. 2008) (because a doctor had "never explained on what basis he doubted" the plaintiff's disability, his report was "an unreasoned and unexplained rejection of the objective evidence in the record"); *Cf. Lucy v. Macsteel Serv. Ctr. Short Term Disability Plan*, 107 F. App'x 318, 321 (4th Cir. 2004) ("no reasonable factfinder could conclude that [the plaintiff] was disabled based on the conclusory statements of two physicians").

That Dr. Bach never physically examined Stewart does not establish the inadequacy of Dr. Bach's opinion. *See* ECF No. 56 at 10-11. The issue before the Board was whether Stewart's NFL injuries would have left him disabled had he never played in the CFL, not whether he was disabled. *See* Admin. Rec. 404, 413. Because the Court is not a medical expert, it cannot conclude that such a causation opinion requires a physical examination.

expertise to determine whether he qualified for Football Degenerative T&P benefits. *See* Admin. Rec. 485. Indeed, the administrative record refers to no other benefit claimants who played in both the NFL and the CFL, and the Court has found no cases with those facts. Accordingly, the Board's experience reviewing other benefit claims would have been of little or no assistance.

That Stewart was able to continue playing football after his NFL injuries does not establish that those injuries were not disabling.[31] The Plan impliedly defines degenerative injuries as those that result in total and permanent disability "before fifteen years after the end of the Player's last Credited Season." *See* Admin. Rec. 404-05. The Plan thus recognizes that the full effects of a degenerative injury may not be apparent for many years. Moreover, only Active Football and Active Non-football T&P benefits require a showing that the disability arose "shortly after" the injury. *See* Admin. Rec. 404-05. To require the same of claims for Football Degenerative benefits would render meaningless the Plan distinctions among the various types of benefits.

In light of the lack of substantial contradictory evidence,

---

[31] *See* Admin. Rec. 492 (noting that the Board "could not ignore that Mr. Stewart played in the CFL for at least four years after his NFL career ended," which "strongly suggest[ed] that his NFL injuries could not, by themselves, have caused total and permanent disability").

the Court finds that the Board arbitrarily discredited Dr.

Meek's opinion that Stewart's NFL injuries left him totally and

permanently disabled.[32]   Although the Board stated that Dr. Meek

lacked the credentials of Drs. Bach and Haas, the Plan clearly

thought highly of him: the Plan, not Stewart, arranged for Dr.

Meek to examine Stewart and provide a medical opinion about his

disability.  *See* Admin. Rec. 277, 491.   The Board's criticism of

Dr. Meek's "unprofessional" tone lacks support.   The Board did

not explain how his comments about Dr. Bach's potential conflict

of interest "cast doubt on the impartiality and reliability of

his [medical] conclusion."  *See* Admin. Rec. 491.   The Board also

did not explain why Dr. Bach's tone was not unprofessional,

given his statement that Dr. Meek "[c]learly . . . [did] not

understand the collective bargaining process and . . .

agreements."  *See* Admin. Rec. 486.   Nor did the Board discredit

Dr. Bach for the unclear opening sentence in his May 27, 2010

letter, which suggested that he had rushed his report.

The Board failed to apply a reasoned and principled

decision-making process as required by the Plan.  *See* Admin.

Rec. 419 (requiring the Board to use the "care, skill, and

diligence" of a "prudent man").   Although the Board consulted

three doctors, only one--Dr. Meek--provided an adequate basis

---

[32] *See Nord*, 538 U.S. at 834 ("Plan administrators ... may not
arbitrarily refuse to credit a claimant's reliable
evidence[.]").

for deciding whether Stewart qualified for Football Degenerative
T&P benefits.  Had the Board acted prudently, it would have
asked Drs. Bach and Haas to explain how they formed their
opinions. *See Gorski*, 314 F. App'x at 547.  Instead, the Board
simply accepted those opinions without adequate explanation.

In sum, at least three factors weigh against the
reasonableness of the Board's decision.  The Board failed to use
a reasoned and principled process (factor 5) or rely on adequate
materials (factor 2).  The Board's process also failed to
comport with the Plan's language (factor 1) about degenerative
injuries and the "care, skill, and diligence . . . that a
prudent man acting in a like capacity and familiar with such
matters" would use. *See* Admin. Rec. 419.

   3. Consistency with Earlier Interpretations of the Plan and
        ERISA's Requirements, Potential Conflicts of Interest,
        and Relevant External Standards (Factors 4, 6-8)

The remaining factors do not bear on the Court's analysis.
The Court cannot determine whether the Board's decision was
consistent with past interpretations of the Plan; the adminis-
trative record does not refer to other claimants who played in
both the NFL and the CFL, and the Court has found no cases
addressing that player history.  Although Stewart has argued
that Bach's report was neither "professional" nor "unbiased,"
*see* ECF No. 56 at 13, he did not argue at trial that the Board

had a conflict of interest.[33]  Finally, the parties have not

referred to any external standards relevant to the Board's

exercise of discretion, and--apart from his assertion that the

Board did not follow the Plan's language[34]--Stewart has not

alleged that the Board's decision was inconsistent with ERISA's

procedural and substantive requirements.[35]

C. The Board's Decision Was An Abuse of Discretion

Considering the relevant factors, the Court concludes that

the Defendants abused their discretion in denying Stewart

Football Degenerative T&P benefits.  Dr. Meek's opinion was the

only adequate basis for the Board's decision.  A "reasoning

mind" would not accept the undetailed reports of Drs. Bach and

---

[33] On January 13, 2011, Magistrate Judge Beth P. Gesner denied
Stewart's discovery request for depositions to "determine the
extent of any conflict of interest." *See* ECF No. 27 at 2, 5.
Judge Gesner was persuaded by an opinion of the Court that had
found that the Board had no conflict of interest, and reasoned
alternatively that Stewart would have to rely on the
administrative record to prove a conflict. *Id.* at 2-4.

[34] *See supra* Part II.B.1.

[35] *See, e.g., Friz v. J&H Marsh & McLennan, Inc.*, 2 F. App'x 277,
282 (4th Cir. 2001) ("decision was consistent with the
procedural and substantive requirements of ERISA" when it was
"consistent with the language of the Plan" and the plaintiff
"was fully aware of his rights and obligations under the Plan");
*Rust v. Elec. Workers Local No. 26 Pension Trust Fund*, Case No.
10-0029, 2011 WL 4565501, at *13 (W.D. Va. 2011) (decision to
terminate and rescind benefits was not "consistent with the
procedural and substantive requirements of ERISA" when the
Defendants had, *inter alia*, failed "to include certain
information in the termination . . . and the appeal denial
letters (such as information regarding Plaintiff's rights under
ERISA to file suit or to request Plan documents)").

Haas as "sufficient to support a particular conclusion" about the cause of Stewart's disability. *See DuPerry*, 632 F.3d at 869. Although the Board was not required to support its decision with a preponderance of the evidence, it needed to produce more than a mere scintilla. *See LeFebre,* 747 F.2d at 208. This it failed to do.

In reaching this conclusion, the Court is aware that the abuse of discretion standard "exists to ensure that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional."[36] Nonetheless, ERISA demands that plan administrators support their decisions with substantial evidence. *See DuPerry*, 632 F.3d  869; *Brogan*, 105 F.3d at 164. Because the Defendants failed to do so, the Court must overturn their decision to deny Stewart Football Degenerative T&P benefits.

"[I]t is generally the case that when a plan administrator's decision is overturned, a remand for a new determination is appropriate." *Gorski*, 314 F. App'x at 548. This is because the "administration of benefit . . . plans should be the function of the designated fiduciaries, not the federal courts." *Id.* Thus, remand is appropriate when the

---

[36] *Berry v. Ciba-Geigy*, 761 F.2d 1003, 1006 (4th Cir. 1985), *cited in Jani v. Bell*, 209 F. App'x 305, 313 n.5 (4th Cir. 2006).

administrator lacked adequate evidence to make a decision,[37] or failed to adequately explain the grounds for the decision.[38] But when "the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate." *Id.*

Remand is not necessary. The Defendants had adequate evidence to make a decision, *see Sheppard*, 32 F.3d at 125, and they adequately explained the grounds for their decision, *see Flinders*, 491 F.3d 1194. Although Drs. Bach and Haas failed to adequately explain their medical opinions, the Board gave several--unsupported--grounds for its decision. *See* Admin. Rec. 490-92. "[R]emand should be used sparingly,"[39] and the Defendants "had more than adequate opportunities to establish an administrative record containing evidence contradicting [Stewart's] evidence" that his disability arose out of his NFL injuries.[40] That the Defendants failed to do so does not require

---

[37] *See Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994).

[38] *See Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1194 (10th Cir. 2007) (*cited in Gorski*, 314 F. App'x at 548).

[39] *See Elliott v. Sara Lee Corp.*, 190 F.3d 601, 609 (4th Cir. 1999) (internal quotation marks omitted).

[40] *See Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1328 (11th Cir. 2001) (affirming district court's decision that remand was not necessary "because the administrator had considered all of the record evidence and had reached a

remand.  *See Levinson*, 245 F.3d at 1328.

The only adequate, well-reasoned medical opinion in the record was provided by Dr. Meek, who opined that Stewart's disability arose out of his NFL injuries.  Thus, the Court will enter judgment for Stewart and order the Defendants to provide him Football Degenerative T&P Benefits.[41]

III. Conclusion

For the reasons stated above, the Court finds that the Defendants abused their discretion under ERISA and will order the Defendants to provide Stewart Football Degenerative T&P benefits, effective as of August 1, 2008.[42]

_____   
6/8/12   
Date

_____   
William D. Quarles, Jr.   
United States District Judge

---

conclusion . . . that was unsupported by the evidence in the record").

[41] *See Gorski*, 314 F. App'x at 549 (remand for a new benefits determination was not necessary because "the only reasonable decision available to [the plan administrator] was to reverse its earlier decision discontinuing [the plaintiff's] benefits"; two doctors had opined that the plaintiff was disabled, and a third doctor's opinion to the contrary was so "incomplete" that "there simply was no basis by which [the plan administrator] could have discredited [the other two doctors'] medical opinions").

[42] *See supra* note 18.

41